

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00291-CV

| | |
|---|---|
| CURTIS CHESSER, INDIVIDUALLY, AND THROUGH HIS SPOUSE AND POWER OF ATTORNEY, AVA CHESSER | APPELLANT AND APPELLEE |
| V. | |
| LIFECARE MANAGEMENT SERVICES, L.L.C. AND LIFECARE HOSPITALS OF NORTH TEXAS, L.P. D/B/A LIFECARE HOSPITAL OF FORT WORTH | APPELLEES AND APPELLANTS |

----------

### FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

### I. INTRODUCTION

A jury returned a verdict for Appellant Curtis Chesser, individually, and through his spouse and power of attorney, Ava Chesser, in his health care liability suit against Appellees LifeCare Management Services, L.L.C. (LMS) and

LifeCare Hospitals of North Texas, L.P. d/b/a LifeCare Hospital of Fort Worth (Hospital). After applying the statutory caps to the noneconomic damages awarded by the jury, the trial court signed a judgment on the jury's verdict. Chesser perfected an appeal, raising one issue: the trial court erred by submitting the negligence of three settling doctors to the jury because no evidence of their negligence exists. Appellees perfected a cross appeal, raising eight issues: two charge error issues, two sufficiency of the evidence issues, and four issues alleging computation errors in the judgment.[1] For the reasons set forth below, we will sustain Chesser's sole issue and will modify the trial court's judgment to delete the percentage-of-responsibility settlement credit given to Appellees; we will apply a dollar-for-dollar settlement credit. We will sustain Appellees' fourth issue challenging the legal sufficiency of the evidence to support the jury's joint enterprise finding and will accordingly modify the trial court's judgment to delete the imposition of joint and several liability on LMS. We will also sustain subpart B of Appellees' fifth issue challenging LMS's joint and several liability with Hospital for Hospital's $250,000 noneconomic damages civil liability and challenging Hospital's joint and several liability with LMS for LMS's $250,000 noneconomic damages civil liability. We will modify the judgment to delete LMS's joint and several liability for Hospital's $250,000 noneconomic damages civil liability and to delete Hospital's joint and several liability for LMS's $250,000 noneconomic damages civil liability and we will render judgment that Hospital and LMS are each severally liable for $250,000 in noneconomic

---

[1]Although LMS and Hospital raise their issues as cross-appellants, we refer to them throughout this opinion as "Appellees" for clarity and ease of reading.

damages plus prejudgment and postjudgment interest on that amount. With these modifications, we will affirm the trial court's judgment.

## II. FACTUAL OVERVIEW

Fort Worth Police Officer Curtis Chesser suffered a mild stroke that affected his ability to swallow. He was without pain and was without cognitive impairment. After spending a few days in Huguley Hospital and Granbury Hospital, he was transferred to Hospital for rehabilitation and therapy. Hospital is a long-term acute care hospital; it does not have an operating room, recovery room, or anesthesia services. At Hospital, Chesser was treated by physicians Dr. Ade Adedokun, Dr. Edward Ferree, and Dr. Burke DeLange. A few days after Chesser's admission to Hospital, in an examination room at Hospital, Dr. DeLange; Carol Smith, R.N.; and Cindy Barnett, R.N. surgically inserted a percutaneous endoscopic gastrostomy (PEG) tube through Chesser's abdominal wall into his stomach. An hour after insertion of the PEG tube, at 10:20 a.m., Chesser's medical chart indicated that he reported pain in his abdomen of 10 on a scale of 1–10.

The bolster or bumper placed around the PEG tube to keep it from moving was too tight, resulting in severe pain to Chesser and prolonged ischemia of the gastric tissue under the tube, which led to necrosis with erosion of the PEG tube through the stomach wall as well as erosion of and hemorrhage of the superior epigastric artery. As Chesser's condition deteriorated over the next four days, his complaints, signs, symptoms, and their cause were not assessed or investigated by Hospital nurses or reported to the doctors. Realizing that something was seriously wrong, Chesser requested a transfer to a full-service hospital. After Chesser's wife observed Chesser excrete a large amount of bright

3

red blood through his rectum, and after Chesser's blood pressure became dangerously low, Chesser was transferred to Harris Hospital. Chesser had spent eight days at Hospital.

At Harris Hospital, an endoscopy was performed. The gastroenterologist performing the procedure discovered a large ulcer on Chesser's stomach lining, significant amounts of blood in Chesser's stomach, and active bleeding from the epigastric artery. During the endoscopy, Chesser "coded" and was resuscitated; Chesser had suffered a cardiopulmonary arrest, cardiac injury, and cerebral injury and had sustained permanent cognitive deficits. Chesser remained in Harris Hospital for several months; he then received outpatient brain injury transitional services through May 2005 and continues to require a variety of health care treatments and services.

## III. STANDARDS OF REVIEW

We utilize the following standards of review in our analysis of the various issues presented and in our analysis of the effect that the sustaining of various issues has upon the trial court's judgment.

### A. Legal Sufficiency of the Evidence

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and*

4

*"Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

## B. Factual Sufficiency of the Evidence

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## C. Submission of Jury Questions, Definitions, and Instructions

A trial court has wide discretion in submitting instructions and jury questions. *Howell Crude Oil Co. v. Donna Ref. Partners, Ltd.*, 928 S.W.2d 100, 110 (Tex. App.—Houston [14th Dist.] 1996, writ denied). A trial court must submit only "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P. 277. A proper jury instruction is one that assists the jury and is legally correct. *Town of Flower Mound v. Teague*, 111

S.W.3d 742, 759 (Tex. App.—Fort Worth 2003, pet. denied). We review the trial court's legally correct definitions, instructions, and questions for an abuse of discretion. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2003); *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000); *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999).

When an appellant challenges the legal sufficiency of the evidence to support the submission of a question to the jury, we review de novo the sufficiency of the evidence applying the legal sufficiency standard of review. *See, e.g.*, *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992) (recognizing that objection to submission of question as based on no-evidence preserves no-evidence challenge for appeal); *Cont'l Cas. Co. v. Street*, 379 S.W.2d 648, 658 (Tex. 1964).

### D. Rules of Statutory Construction

Issues of statutory construction present questions of law that we review de novo applying well-established rules of construction. *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008), *cert. denied*, 129 S. Ct. 2157 (2009). Our primary objective in statutory construction is to give effect to the legislature's intent. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). To achieve this, "we look first and foremost to the words of the statute." *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We construe the statute's words according to their plain and common meaning, unless a contrary intention is apparent from the context or unless such a construction leads to absurd results.

6

*City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008); *see also* Tex. Gov't Code Ann. § 311.011(a) (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). We also use definitions prescribed by the legislature and any technical or particular meaning the words have acquired. *See* Tex. Gov't Code Ann. § 311.011(b).

Further, we must read the statute as a whole and not just isolated portions. *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004); *Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 253 (Tex. App.—Dallas 2005, no pet.) ("We determine legislative intent from the entire act and not just its isolated portions."). It is a well-settled rule of statutory construction that every word of a statute must be presumed to have been used for a purpose. *Gray v. Nash*, 259 S.W.3d 286, 291 (Tex. App.—Fort Worth 2008, pet. denied). Likewise, every word excluded from a statute must also be presumed to have been excluded for a purpose. *Id*. We are required to reconcile and harmonize apparently conflicting statutory provisions, if it is reasonably possible, so that every enactment may be given effect. *Barfield v. City of La Porte*, 849 S.W.2d 842, 845 (Tex. App.—Texarkana 1993), *aff'd*, 898 S.W.2d 288 (Tex. 1995). We also consider the objective the law seeks to obtain and the consequences of a particular construction. Tex. Gov't Code Ann. § 311.023(1), (5) (West 2005). In enacting a statute, it is presumed that a just and reasonable result is intended. *Id*. § 311.021(3) (West 2005).

7

When a general statutory provision conflicts with a special statutory provision, both provisions shall be construed, if possible, to give effect to both; but, if the conflict is irreconcilable, the special provision prevails absent certain exceptions. *Id.* § 311.026 (West 2005). Also when applying rules of statutory construction, the more recent enactment prevails. *Id.* § 311.025(a) (West 2005); *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 901 (Tex. 2000); *Johnstone v. State*, 22 S.W.3d 408, 409 (Tex. 2000).

### E. Abuse of Discretion

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

An abuse of discretion does not occur when the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

### IV. SUFFICIENCY OF THE EVIDENCE CHALLENGES

In his sole issue, Chesser contends that no evidence exists supporting the

submission of the negligence of the settling defendants—Dr. Adedokun, Dr. Ferree, and Dr. DeLange—to the jury in question 2 of the court's charge and, correspondingly, that no evidence exists to support the submission of the settling defendants' percentage of responsibility in question 3. Specifically, Chesser argues that there is no expert testimony of a standard of care applicable to these three doctors, no evidence of any breach of any standard of care, and no evidence that any breach of any standard of care by these three doctors was a proximate cause of Chesser's damages; in short, Chesser contends that no evidence exists supporting the submission of these doctors' negligence to the jury.

In their second and fourth issues, respectively, Appellees argue that legally and factually insufficient evidence exists to support the jury's finding in question 1 that Hospital was negligent and in question 6 that LMS and Hospital were engaged in a joint enterprise.

### A. No Evidence to Support Submission of Negligence of Settling Doctors

In addressing Chesser's challenge to the legal sufficiency of the evidence to support submission to the jury of the settling defendants' negligence in question 2 and of the settling defendants' percentage of responsibility in question 3,[2] we first examine the comparative responsibility statute. Texas Civil Practice

---

[2]Appellees requested questions 2 and 3, submitting the settling defendants' negligence and percentage of responsibility. Chesser objected to the submissions and subsequently filed a motion to disregard the jury's finding

9

and Remedies Code[3] section 33.003 provides:

> (a)   The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person's causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:
>
>> (1)   each claimant;
>>
>> (2)   each defendant;
>>
>> (3)   each settling person; and
>>
>> (4)   each responsible third party who has been designated under Section 33.004.
>
> (b)   *This section does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission*.

Tex. Civ. Prac. & Rem. Code Ann. § 33.003 (West 2008) (emphasis added).

Thus, if legally sufficient evidence does not exist of the negligence of a settling physician, his percentage of responsibility should not be submitted. *See id.* § 33.003(b) (expressly prohibiting submission to jury of any person's percentage of responsibility absent legally sufficient evidence); *Rehab. Facility at Austin, Inc. v. Cooper*, 962 S.W.2d 151, 154 (Tex. App.—Austin 1998, no pet.) (interpreting

that the settling defendants were negligent and the finding apportioning a percentage of responsibility to them.

[3]This appeal involves the application of various sections of the civil practice and remedies code.  All references herein are to that code unless specified otherwise.

predecessor statute and holding that trial court properly refused to submit settling defendant's negligence to jury); *see also* Tex. R. Civ. P. 278 (authorizing trial court to submit to jury only questions raised by pleadings and evidence); *Kroger Co. v. Betancourt*, 996 S.W.2d 353, 358 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (holding submission of question on comparative responsibility of settling defendant is required only if evidence exists supporting liability on part of settling defendant). That is, section 33.003, the comparative responsibility statute, does not provide any independent basis for submitting to the jury the percentage of responsibility of a settling defendant absent evidence supporting the submission.

In order to submit to the jury a defendant's negligence in a health care liability claim, there must be legally sufficient evidence of a duty to act according to the applicable standard of care, of a breach of the standard of care, and of a causal connection between the breach and the injury. *Morrell v. Finke*, 184 S.W.3d 257, 271 (Tex. App.—Fort Worth 2005, pet. ref'd). Expert testimony is required to establish the governing standard of care and whether that standard has been breached. *Rehab. Care Sys. of Am. v. Davis*, 73 S.W.3d 233, 234 (Tex. 2002). Likewise, expert testimony based on reasonable medical probability is required to establish proximate cause. *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010); *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995).

We have thoroughly reviewed the record and have looked specifically at

11

every record reference cited in Appellees' brief as containing expert testimony or evidence of the settling defendants' negligence; Chesser is correct. No expert testimony exists in the record before us of a standard of care applicable to these three doctors, no evidence exists of any breach of any standard of care, and no evidence exists that any breach of any standard of care by these three doctors was a proximate cause of Chesser's damages. Although Chesser called each of the settling defendants to testify at trial, no testimony was elicited from them concerning their respective standards of care, their breach of any standard of care, or proximate cause. The only expert testimony in the record concerning the standards of care applicable to the settling defendants, any breach of those standards of care, or any proximate cause is, as pointed out by Chesser, wholly conclusory[4] and constitutes no evidence. *See, e.g.*, *Coastal Transp. Co.*, 136 S.W.3d at 232;[5] *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711–12

---

[4]Because Chesser contends that this testimony is conclusory on its face, no objection at trial was required. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004).

[5] The supreme court in *Coastal* explained:

> [A]lthough expert opinion testimony often provides valuable evidence in a case, "it is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999). Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact "more probable or less probable." *See* Tex. R. Evid. 401.

(Tex. 1997), *cert. denied*, 523 U.S. 1119 (1998).

For example, Dr. Stephen Koch, one of Chesser's experts whose testimony Appellees point to as providing evidence of the settling defendants' standard of care, breach, and causation, simply testified:

> Q. You render opinions as an–as an expert witness in this case that Dr. Daddyo–Adedokun was negligent in his care and treatment of Mr. Chesser, didn't you?
>
> A. In my deposition, yes.
>
> Q. And you rendered opinions that that care and treatment was a proximate case [sic] of his injury, didn't you?
>
> A. That was one of the–one of the factors, yes.
>
> Q. Okay. So you're–you've been a–an expert against–with respect to the care and treatment of Dr. Adedokyn. You also rendered opinions that Dr. Ferree was negligent in his care and treatment of Mr. Chesser at LifeCare, didn't you?
>
> A. During the treatment at LifeCare, yes.
>
> Q. And you rendered the opinion that care and treatment was a proximate cause of his injury, didn't you?
>
> A. Yes.[6]

Case law uniformly holds that such conclusory testimony constitutes "no evidence." *See, e.g.*, *Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 839

---

136 S.W.3d at 232.

[6]At another point in his testimony, Dr. Koch specifically testified that an ordinary prudent physician not informed by nurses of the level of pain reported by Chesser related to the insertion of the PEG tube on November 16, 17, or 18 would not be able to figure out what problem Chesser was experiencing.

(Tex. 2010) (holding evidence legally insufficient to support causation because "Dr. Beyler may be qualified in fire research, but his testimony in this case lacks objective, evidence-based support for its conclusions"); *City of San Antonio v. Pollock*, 284 S.W.3d 809, 820 (Tex. 2009) (holding evidence legally insufficient to support causation because "Patel's opinions were conclusory and provided no evidence"); *Coastal Transp. Co.*, 136 S.W.3d at 232; *Havner*, 953 S.W.2d at 711–12. Expert testimony utilizing the "magic words" of "negligence" and "proximate cause" constitutes no evidence if the testimony is simply the expert's bare opinion; it is the substance of the testimony that must be considered. *Havner*, 953 S.W.2d at 711–12; *see also McIntyre v. Ramirez*, 109 S.W.3d 741, 749 (Tex. 2003) ("A conclusory statement of an expert witness is insufficient to create a question of fact."). Here, there is no substantive testimony regarding the standard of care, breach, and causation concerning the alleged medical negligence of Drs. Adedokun, Ferree, and DeLange in their care and treatment of Chesser. At most, the record contains only a bare recitation of an expert's prior opinion using the magic words of negligence and proximate cause. Because the only evidence concerning the alleged medical negligence of Drs. Adedokun, Ferree, and DeLange is conclusory expert testimony, no evidence exists supporting submission of the negligence of these doctors to the jury.[7] We

---

[7]Despite Appellees' request that the negligence and percentage of responsibility of the settling doctors be submitted to the jury, Appellees' theory of the case was that the settling doctors were not negligent. During closing argument, Appellees' counsel explained, "Now, did we bring you evidence that

14

sustain Chesser's sole issue.

We next address what effect sustaining Chesser's sole issue has on the judgment.[8] The settling defendants paid a total of $183,000 in damages and $48,334 in costs to settle Chesser's claims against them. Prior to trial, Appellees elected the percentage settlement credit. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.012(c)(2) (West 2008). The percentage of responsibility that the jury attributed to the settling defendants totaled 10%. Accordingly, to effectuate the settlement credit elected by the Appellees, the judgment signed by the trial court applied a settlement credit of $377,383.53.[9] The judgment subtracts the settlement credit of $377,383.53 from the total damages awarded in the judgment. The judgment also subtracts $48,334 from the court costs recoverable by Chesser.

The issue of the amount of the settlement credit to be applied to the judgment is controlled by section 33.012 of the civil practice and remedies code, titled, "Amount of Recovery." *See id.* § 33.012. It provides in pertinent part:

> (b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar

---

Dr. Adedokun or Dr. DeLange or Dr. Ferree were negligent? No, we didn't, because we don't believe they were."

[8] Chesser specifically does not seek a remand on this issue.

[9] The parties did not dispute in the trial court and do not challenge on appeal the correctness of this settlement credit amount as a 10% reduction of the amount of damages to be recovered by Chesser.

15

amounts of all settlements.

(c)  Notwithstanding Subsection (b), if the claimant in a health care liability claim filed under Chapter 74 has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by an amount equal to one of the following, as elected by the defendant:

> (1)  the sum of the dollar amounts of all settlements; or

> (2)  a percentage equal to each settling person's percentage of responsibility as found by the trier of fact.

(d)  An election made under Subsection (c) shall be made by any defendant filing a written election before the issues of the action are submitted to the trier of fact and when made, shall be binding on all defendants.  If no defendant makes this election or if conflicting elections are made, all defendants are considered to have elected Subsection (c)(1).

*Id.*

Because no evidence exists supporting submission of the settling defendants' negligence to the jury, their percentage of responsibility should not have been submitted and no percentage of responsibility should have been allocated by the jury to the settling defendants; indeed, how could the jury assess a percentage of responsibility to the settling defendants in the absence of legally sufficient evidence of their negligence?  And because, based on the evidence, no percentage of responsibility should have been allocated to the settling defendants, Appellees cannot be entitled to a percentage-of-responsibility settlement credit.  *See id*. §§ 33.003(b), .012(c)(2).

But, section 33.012(b) provides that when a claimant has settled with a person, the court shall reduce the claimant's damages by the dollar amount of all

16

settlements. *Id*. § 33.012(b). And section 33.012(d) provides that even if a defendant in a health care liability claim forgets to, or simply fails to, make any election concerning a settlement credit, then nonetheless the dollar-for-dollar settlement credit applies. *See id*. § 33.012(d). So, in this case, under either subsection (b) or subsection (d), Appellees are entitled to a dollar-for-dollar settlement credit equal to $183,000—the damages paid in settlement by the settling defendants.[10]

In the judgment, after application of the relevant damage cap provisions to the damages found by the jury, the trial court further reduced the damages by the percentage settlement credit of $377,383.53. Based on our holding above, the judgment should not be reduced by the percentage-of-responsibility settlement credit of $377,383.53, but nonetheless must be reduced pursuant to either section 33.012, subsection (b) or subsection (d), by the dollar-for-dollar settlement credit amount of $183,000.[11] Accordingly, we reverse the portion of the trial court's judgment applying the $377,383.53 percentage settlement credit

---

[10]Chesser contends that Appellees are entitled to no settlement credit at all based on *McAllen Kentucky Fried Chicken No. 1, Inc., v. Leal*, 627 S.W.2d 480, 485 (Tex. App.—Corpus Christi 1981, writ ref'd n.r.e.). *Leal*, however, interpreted former Texas Revised Civil Statute article 2212a, which was repealed in 1985; *Leal* is not applicable to our construction of section 33.012.

[11]The final judgment signed by the trial court includes as attachments various charts and computations in essence "showing the math" of how the trial court arrived at the numbers it did. These attachments enable us to calculate exactly the change in the judgment wrought by application of a dollar-for-dollar settlement credit instead of a percentage settlement credit. We do so in our judgment.

17

and render judgment applying the $183,000 dollar-for-dollar settlement credit. *See* Tex. R. App. P. 43.2(c), 43.3.

### B. Sufficiency of Evidence to Support Joint Enterprise Finding; No Evidence of Community of Pecuniary Interest in the Common Purpose of the Enterprise Between Appellees

In their fourth issue, Appellees assert that legally and factually insufficient evidence exists to support the jury's finding in question 6 that a joint enterprise existed between LMS and Hospital. Specifically, Appellees challenge the sufficiency of the evidence to support the second two elements of joint enterprise: (3) a community of pecuniary interest in the common purpose of the enterprise among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

The Texas Supreme Court has addressed legal sufficiency challenges to the third element, the community-of-pecuniary-interest-in-the-common-purpose-of-the-enterprise element, of a jury's joint enterprise finding in several cases. *See St. Joseph Hosp.*, 94 S.W.3d at 531–33 (holding evidence legally insufficient); *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 613–14 (Tex. 2000) (holding evidence legally sufficient); *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 932 (Tex. 1995) (holding evidence legally insufficient); *Shoemaker v. Estate of Clyde Whistler*, 513 S.W.2d 10, 15–17 (Tex. 1974) (holding evidence legally insufficient). A review of these cases makes it clear that to satisfy this element of a joint enterprise, evidence must exist of a monetary interest in the enterprise common to each member of the enterprise; the monetary interest of each

18

member of the group in the enterprise must be "shared without special or distinguishing characteristics." *St. Joseph Hosp.*, 94 S.W.3d at 531; *see also Able*, 35 S.W.3d at 614 (holding legally sufficient evidence of this element existed when written agreement between members of enterprise specifically mentioned investment of substantial sums for mass transit purposes); *Shoemaker*, 513 S.W.2d at 17 (holding that two joint owners of an aircraft had "no pecuniary interest in the common purpose of the search" that was occurring when the plane crashed and Shoemaker's son was killed).

We have carefully reviewed the record as well as nine boxes of original exhibits filed with this court. The record before us "discloses a complete absence of evidence of a vital fact," that being a community of pecuniary interest in the common purpose of the enterprise that existed between Appellees. *See Uniroyal Goodrich Tire Co.*, 977 S.W.2d at 334 (requiring appellate court to sustain legal sufficiency challenge when record discloses a complete absence of evidence of a vital fact). The evidence establishes that Hospital is managed by LMS and that LMS manages two other Texas hospitals, one in Plano and one in Dallas. As evidence supporting the jury's joint enterprise finding, Chesser points to the following: the testimony of William R. Fox, who was formerly Senior Vice President of Operations of LMS; the governing board bylaws governing Appellees' relationship with one another; a governing board orientation policy

19

promulgated by LMS;[12] the testimony of Elizabeth Higgenbotham, an expert in

---

[12]The governing board orientation policy listed the following as the governing board's role in facility finance:

a. Hires and defines the total compensation level of the Administrators. The latter directs the daily operation of the facility and manages its financial matters to achieve its stated mission.

b. Develops a sound understanding of the sources of the facility's revenue and expenses and its economic environment.

c. Approves financial goals that are designed to ensure the long-term financial viability of the facility and the basis upon which achievement of these goals can be measured.

d. Approves short and long range financial policies that are consistent with and will enable the facility to achieve its financial goals.

e. Establishes a code of conduct for board members and management and monitors compliance with this code.

f. Approves short and long-term operating, cash, and capital budgets that are consistent with the facility's overall financial goals.

g. Assists in planning and provides support for philanthropic activities as desired.

h. Approves methods of financing major capital asset renovations, replacements, and additions.

i. Reviews financial reports and operating statistics on a regular basis to ensure that the facility takes appropriate action in response to operating trends to achieve its financial goals.

j. Works with the facility's external auditors and evaluates information from the internal and external auditors about the status of financial controls and compliance with government regulations.

k. Evaluates and approves financial plans for new business ventures, programs and services and establishes criteria to measure their ongoing viability.

20

the area of health care management, consultation, medical/legal, risk management, and health care systems and operations; and the testimony of Dr. Koch. This evidence unquestionably establishes that LMS was the "umbrella" organization over Hospital; that Hospital was to operate as a for-profit, long-term acute care specialty hospital; that per the governing board bylaws, LMS was to "review annual operating and capital budgets" of Hospital; and that per the governing board bylaws, LMS was to oversee Hospital's budget.

Chesser points to no evidence, however, and we have located none in the record, showing how the monies generated by Hospital were allocated or shared between Hospital and LMS. *See St. Joseph Hosp.*, 94 S.W.3d at 531; *David L. Smith & Assocs., L.L.P. v. Stealth Detection, Inc.*, 327 S.W.3d 873, 878–79 (Tex. App.—Dallas 2010, no pet.) (holding legally insufficient evidence of joint enterprise between companies existed despite evidence of shared officers, directors, employees, business address, logo, and assets when no evidence existed of how or whether monetary benefits were shared between the two entities). Similarly, the record contains no evidence of how the monies generated by LMS were allocated or shared between Hospital and LMS. *See St. Joseph Hosp.*, 94 S.W.3d at 531; *David L. Smith & Assocs., L.L.P.*, 327 S.W.3d at 878–79. The mere existence of monetary benefits to both Hospital and LMS by virtue of their relationship is insufficient to establish the third element of a joint

enterprise; there must be evidence that the monetary benefits were shared among the members of the enterprise without special or distinguishing characteristics. *See St. Joseph Hosp*., 94 S.W.3d at 531; *David L. Smith & Assocs., L.L.P.*, 327 S.W.3d at 878–79; *see also Blount*, 910 S.W.2d at 933 (explaining that circumstantial evidence that could give rise to any number of inferences was insufficient to satisfy third element of joint enterprise); *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 851 (Tex. App.—Fort Worth 2006, no pet.) (holding evidence was legally insufficient on third element of joint enterprise because although both entities of the alleged joint enterprise "contemplated economic gain," "that gain was not shared without special or distinguishing characteristics," but instead one entity passed along revenue attributable to work of the other and kept for itself revenue attributable to the work of its own drivers).

Chesser argues that Hospital and LMS (along with the other two hospitals managed by LMS) utilized shared billing, shared managed care contracting, and shared financial, legal, administrative, and human resources departments to make better use of resources for economic gain. Fox testified that there was a centralized human resource function at the corporate office but that each hospital had its own human resource representative. The pooling of resources between members of a joint enterprise to further the economic gain of the enterprise is a factor the supreme court has looked at in determining whether evidence of a community of pecuniary interest in the common purpose of the enterprise among

the members exists. *See Able*, 35 S.W.3d at 613–14. In *Able*, the documents executed between the parties "clearly contemplate[d] an economic gain that could [have been] realized by undertaking the activities in the [pooling] manner." *Id*. Here, although some centralized functions were undertaken by LMS on behalf of Hospital, no evidence exists that any financial gain from this pooling was shared between Appellees without special or distinguishing characteristics. Unlike in *Able*, the record here simply does not indicate what the monetary consequence of the "pooling" of resources pointed to by Chesser is for either Hospital or LMS.

Considering all of the evidence in the light most favorable to the third element of the jury's joint enterprise finding, we hold that no evidence exists of a community of pecuniary interest in the common purpose of the enterprise between Hospital and LMS.[13] *See St. Joseph Hosp.*, 94 S.W.3d at 531; *David L. Smith & Assocs., L.L.P.*, 327 S.W.3d at 878–79; *Omega Contracting, Inc.*, 191 S.W.3d at 851. We sustain Appellees' fourth issue.

We next address what effect sustaining Appellees' fourth issue has on the

---

[13]Having determined that legally insufficient evidence exists to show a community of pecuniary interest in the common purpose of the enterprise between Hospital and LMS, we need not address Appellees' factual sufficiency challenge to this element of joint enterprise or Appellees' contention, also asserted in their fourth issue, that the evidence is also legally and factually insufficient to establish the fourth element of a joint enterprise—an equal right to a voice in the direction of the enterprise, which gives an equal right of control. *See* Tex. R. App. P. 47.1 (requiring appellate court to address only issues necessary to final disposition of the appeal).

judgment.  The purpose of the theory of joint enterprise is to make each party to the enterprise the agent of the other and thereby to hold each responsible for the negligent act of the other.  *See, e.g., Able*, 35 S.W.3d at 616 (recognizing that "each party in a joint enterprise is responsible for the negligent act of the other"); *Shoemaker*, 513 S.W.2d at 16 (explaining that "the negligence of pilot Carroll is to be imputed to joint owner Whistler, thus establishing the vicarious liability of Whistler").  Here, in the percentage of liability question, the jury apportioned 60% responsibility to Hospital and 30% responsibility to LMS.  Based on the jury's joint enterprise finding, the final judgment imposes joint and several liability on both Appellees for the entire judgment.  The result of our holding that legally insufficient evidence exists to support the jury's joint enterprise finding is that LMS (because it was found to be 30% responsible and because it cannot be held vicariously liable for Hospital's negligence per the joint enterprise finding) is responsible for only 30% of the total judgment and is not jointly and severally liable with Hospital for the entire judgment amount.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.013(a), (b)(1) (providing that a liable defendant is responsible for only the percentage of damages found by the trier of fact equal to the defendant's negligence unless the percentage of responsibility is greater than 50%, in which case the defendant is jointly and severally liable for all damages recoverable by the claimant).  Accordingly, we modify the judgment to delete LMS's joint and several liability and render judgment that it is liable for only 30% of the total judgment amount.

24

## C. Sufficiency of Evidence to Support Proximate Cause Element of Negligence Finding Against LMS

Chesser alleged negligence against LMS, claiming that, as the manager of Hospital, LMS was directly responsible for managing, controlling, directing, operating, supervising, and evaluating the care, services, competence, and quality of care and services provided at Hospital. Chesser alleged that LMS created policies, procedures, bylaws, rules, and regulations that governed Hospital and that LMS was responsible for ensuring that the policies and procedures it implemented were in fact instituted and evaluated and that Hospital complied with them. In Appellees' second issue, LMS argues that legally, or alternatively factually, insufficient evidence exists to support the jury's finding of negligence against it in question 1.[14] LMS specifically alleges that the evidence is insufficient to show that any breach of the standard of care by LMS was in

---

[14]Question 1 asked:

Did the negligence, if any, of those named below, proximately cause the injuries in question?

Answer "Yes" or "No" for each of the following:

LifeCare Hospitals of North Texas, L.P.
d/b/a LifeCare Hospitals of Fort Worth:     _____

LifeCare Management Services, L.L.C.:     _____

In answering Question No. 1, do not consider or otherwise attribute any act or omission of any physician to LifeCare Hospitals of North Texas, L.P. d/b/a LifeCare Hospitals of Fort Worth or LifeCare Management Services, L.L.C.

The jury answered "yes" as to both entities.

25

reasonable medical probability a proximate cause of Chesser's injuries.[15]  As set forth below, the evidence is legally and factually sufficient to support the jury's finding that LMS's negligence—in failing to promulgate policies and procedures relating to post-PEG procedure patients and job descriptions for nurses in the procedure room and in failing to ensure or monitor the enforcement of LMS's policies and procedures at Hospital—proximately caused Chesser's injuries.

1. **The Definitions of Negligence and Proximate Cause Concerning LMS**

In the absence of an objection to a definition, when reviewing the legal and factual sufficiency of the evidence, we measure the evidence against the charge given, applying the definitions given.  *See St. Joseph Hosp*., 94 S.W.3d at 530. The court's charge defined "negligence," when used with respect to the conduct of LMS, to mean

---

[15]Appellees do not challenge the legal or factual sufficiency of the evidence to support the jury's "yes" finding as to the negligence of Hospital.  Consequently, this unchallenged jury finding is binding on appeal.  *See Solares v. Solares*, 232 S.W.3d 873, 880 (Tex. App.—Dallas 2007, no pet.); *Reliance Ins. Co. v. Denton Cent. Appraisal Dist*., 999 S.W.2d 626, 629 (Tex. App.—Fort Worth 1999, no pet.).

Appellees do not brief a sufficiency challenge to any other element of negligence—only proximate cause.  *See* Appellees' brief of cross-appellants, p. 14.  Appellees state in their brief,

Although the jury heard expert opinion regarding alleged breach of the standard of care by LMS (of which Cross-Appellants do not concede), the jury heard from no medical or administrative expert that any of these alleged breaches of the standards of care by LMS, in reasonable medical probability, proximately caused Mr. Chesser's injuries.

26

failure to use ordinary care, that is, failing to do that which a long-term acute care hospital management company of ordinary prudence would have done under the same or similar circumstances or doing that which a long-term acute care hospital management company of ordinary prudence would not have done under the same or similar circumstances.

The court's charge defined "proximate cause" when used with respect to the conduct of LMS to mean

that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a long-term acute care hospital management company using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

### 2. The Law Concerning Negligence by LMS

A hospital or a corporate health care provider may be liable for injuries arising from the negligent performance of a duty that the hospital or corporate health care provider owes directly to a patient. *See Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 409 (Tex. App.—Fort Worth 2003, no pet.); *Denton Reg'l Med. Ctr. v. LaCroix,* 947 S.W.2d 941, 950 (Tex. App.—Fort Worth 1997, pet. denied). One such duty is the duty to use reasonable care in formulating the policies and procedures that govern the hospital's medical staff and nonphysician personnel. *Denton Reg'l Med. Ctr*., 947 S.W.2d at 950. In cases involving alleged administrative negligence arising out of or relating to the provision of medical services, the trier of fact must be guided by medical expert testimony. *Mills v. Angel*, 995 S.W.2d 262, 268 (Tex. App.—Texarkana 1999, no pet.);

27

*Denton Reg. Med. Ctr.*, 947 S.W.2d at 950–51; *see Romero v. Baptist/St. Anthony's Hosp. Corp.*, No. 07-00-00341-CV, 2001 WL 946497, at *2 (Tex. App.—Amarillo Aug. 16, 2001, no pet.) (not designated for publication).

### 3. The Law Concerning Proximate Cause

Plaintiffs in medical negligence cases are required to prove by a preponderance of the evidence that the allegedly negligent act or omission was a proximate cause of the harm alleged. *See Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400 (Tex. 1993). The ultimate standard of proof on the causation issue "is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Park Place Hosp.*, 909 S.W.2d at 511. The precise words of "reasonable medical probability" are not essential, but evidence of causation must still rise above mere conjecture or possibility. *See Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988). The trier of fact may decide the issue of proximate cause in medical malpractice cases based upon (1) general experience and common sense from which reasonable persons can determine causation, (2) scientific principles provided by expert testimony allowing the factfinder to establish a traceable chain of causation from the condition back to the event, or (3) a probable causal relationship as articulated by expert testimony. *Marvelli v. Alston*, 100 S.W.3d 460, 470 (Tex. App.—Fort Worth 2003, pet. denied).

### 4. Evidence Concerning LMS's Negligence and Proximate Cause

28

Here, although Dr. DeLange was in the procedure room on November 16 during the insertion of Chesser's PEG tube and was in charge of the procedure, Carol Smith, R.N. testified that during the PEG procedure, she made the incision, she helped thread the wire and the tube into Chesser's stomach, and she tightened the bolster. She said Chesser's was the first PEG procedure that she actually performed. Nurse Smith testified that Cindy Barnett, R.N. provided sedation to Chesser during the procedure.

According to Chesser's expert Dr. Koch, after insertion of the PEG tube, Chesser's condition steadily declined. He experienced extreme pain for days and became confused as his mental state deteriorated. On the afternoon of November 20, Mrs. Chesser reported that Chesser had coughed and that bright red blood had squirted out of his PEG tube. At 6:30 that evening, Mrs. Chesser walked Chesser to the restroom and saw him excrete bright red blood from his rectum, filling the toilet. Throughout November 20, Chesser's blood pressure declined and continued to decline despite the administration of 750cc's of fluid. Finally, the head of Chesser's bed was lowered in a maneuver called a Tendelenburg to preserve the flow of blood to Chesser's brain, and an ambulance was called. Chesser was admitted to Harris Hospital, and the next morning an endoscopy was performed.

During the endoscopy, Chesser suffered a heart attack and ultimately, although he was successfully revived, sustained serious physical and neurological injuries. He was placed on a ventilator for an extended period of

29

time and remained hospitalized at Harris Hospital for several months. He developed a series of infections over the ensuing weeks to months related to the surgical incision site where the PEG had been resected. He developed bloodstream infections, lung infections, and pneumonia; a trachestomy was required.

Dr. Koch explained that the postoperative report of the endoscopy performed at Harris Hospital and the pathology report from that procedure document that at the PEG tube site, underneath the PEG bumper (also called a bolster),

> [r]ight about where the PEG was put in, the stomach, the whole length of the way through, the stomach had died. So it had died. That tissue right under the PEG was dead. And it was bleeding. Now that takes a period of time to develop. About 48 hours, 24 to 72 hours, that time frame.

Dr. Koch testified that necrosis does not just appear "out of the blue" but is preceded by ischemia; Dr. Koch testified that the ischemia that Chesser suffered at the PEG tube site was caused by the PEG tube bolster or bumper being too tight, "starting to cut off the blood flow to the part of the stomach right below where it was put - - pinching it."

The documentary evidence in the record—LMS's own records—establish that LMS as the management company for Hospital was responsible for drafting, implementing, and enforcing compliance with policies and procedures at Hospital. By virtue of the governing board bylaws, LMS controlled the board, and the board was expressly "responsible for the quality of care" and "quality

30

improvement mechanisms" at Hospital.[16]   Expert Elizabeth Higgenbotham testified that "the LMS voting members are the majority of the board."  She testified,

> [T]he policies and procedures that we're going to look at in this case go from the very top.  They come from LMS, and they go to the hospitals.  So the policies and procedures, and when we do a top down analysis, it's literal.  The buck stops and starts with those folks at the top.

Likewise, Nurse Moore, the Director of Nursing at Hospital when Chesser was a patient there, testified that she worked under policies and procedures that were promulgated by LMS.  Nurse Moore testified that there were no polices or procedures governing nurses in the procedure room or governing post-PEG tube insertion patients.

Thus, the record establishes by written documentary evidence as well as by expert testimony that LMS had a duty to manage, control, direct, supervise, and evaluate the care, services, competence, and quality of care and services provided at Hospital; a duty to create policies, procedures, bylaws, rules, and regulations that govern Hospital; and a duty to ensure that the policies and procedures it implemented were in fact instituted and evaluated and that

---

[16]The governing board orientation policy introduced as Chesser's exhibit 64A explains that "1) The composition of the Governing Board represents corporate leadership by LifeCare Management Services [LMS]," that "2) The Governing Board is responsible for the overall operation of the hospital, the protection of its assets, and *the outcomes of all services provided to its patients*," and that "3) This responsibility is both *a moral and legal obligation*."  [Emphasis added.]

compliance was enforced by Hospital.

Concerning the specific breach of these duties in this case, Higgenbotham testified that LMS was negligent because—despite the fact that under the governing board bylaws, Hospital was only a "for profit, long-term acute care specialty hospital" that possessed no operating room or anesthesia services—Hospital permitted nurses to consciously sedate patients like Chesser and permitted nurses to surgically insert PEG tubes into patients' stomachs, including Chesser's stomach.[17]  Higgenbotham testified that Hospital kept a log documenting the PEG procedures that had been performed in examination rooms at Hospital since 1999.  She testified that LMS was aware via Nurse Moore that PEG procedures were being performed at Hospital; yet, despite LMS's knowledge that PEG procedures were being performed at Hospital, LMS failed to implement policies and procedures relating to a post-PEG insertion care plan.  LMS also failed to implement any job description for a nurse's function in the procedure room with regard to insertion of PEG tubes, although LMS was

---

[17]Higgenbotham testified:

[I]n this particular case, there is knowledge of what the risks are with this procedure.  We have somebody who's being consciously sedated by a person who doesn't have the qualifications to do it.  They haven't been trained.  We have nurse who are inserting knives and sharp instruments into a patient's abdomen, who likewise don't have the qualifications or credentials to do it.  And then there is open awareness, by their own documentation on the transdisciplinary team conference, of what the risks are.  And they do no care planning, and they continue to do the procedure anyway.

aware nurses were participating in this procedure.

Dr. Koch testified that virtually all of Chesser's injuries, including his hemorrhaging, the code, and the consequences of those events, including Chesser's cognitive impairment,[18] would have been avoided if the bolster around the PEG tube had not been too tight or had been loosened on November 16, 17, or 18.[19]

One of the policies that was implemented by LMS at Hospital required the nurses to prepare a care plan for each patient. Nurse Moore agreed that every patient must have a care plan. The care plan is meant to be an interdisciplinary communication tool enabling any and all medical personnel to look at the care plan at any given point and "see what is going on with this patient." Higgenbotham testified that nursing implementation of a care plan for every patient is not optional; instead, it is statutorily required of all registered nurses in Texas. The care plan is a "tool for communication because it is constantly updated." Higgenbotham explained that if a care plan is not utilized, "you're only doing things like treating the symptoms, we don't have a goal for the patient, and nobody understands what the problem is."

---

[18]Chesser also suffered from depression, anxiety, debilitation, and short-term memory loss; Dr. Koch testified, "[T]hese patients require, and he does specifically, somebody kind of being there all the time. He's like a - -he's like a toddler in a big adult's body."

[19]Nurse Smith agreed that at any time during Chesser's stay at Hospital, she could have checked Chesser's PEG tube bolster and loosened it.

Higgenbotham testified, and Nurses Smith and Moore conceded, that the nurses at Hospital failed to institute a care plan for Chesser. Nurse Smith agreed that care plans are an essential tool for communication between the team of doctors, nurses, and other health care professionals caring for a patient. Nurse Smith also conceded that her job description mandated that she create a care plan for all patients for collection of relevant data and to ensure that a care plan exists; she conceded that she did not do so for Chesser. Higgenbotham opined that LMS was negligent in failing to ensure that care plans were utilized at Hospital and were specifically utilized for Chesser.[20] Higgenbotham said, "I don't really think there was a plan of care. I think there was an attempt to pencil-whip this document to make it look like there was a plan of care."[21]

Higgenbotham and Dr. Koch testified that had a care plan been utilized for Chesser, the severe pain he was suffering would have been documented and

[20]Chesser's exhibit 67A—LMS's and Hospital's "Standards for Acute and Critical Care Nursing Practice"—provides in part that "THE NURSE CARING FOR ACUTE AND CRITICALLY ILL PATIENTS DEVELOPS A PLAN OF CARE THAT PRESCRIBES INTERVENTIONS TO ATTAIN EXPECTED OUTCOMES." [Emphasis in original.] The policy explains that the plan is individualized to reflect the patient's characteristics and needs, is developed collaboratively with the team, reflects current acute and critical care nursing practice, provides for continuity of care, establishes priorities for care, and is "*documented to promote continuity of care.*" [Emphasis added.]

[21]Nurse Smith testified that there were several care plans in Chesser's medical records generated by a physical therapist, a dietician, and an occupational therapist, but she agreed that Chesser's medical records contain no care plan for the nursing department after Chesser's admission on November 12, 2004. She agreed that her job description required her to "[d]evelop a care plan that prescribes intervention to attain expected outcomes."

34

would have been apparent to all nurses and doctors caring for him. Additionally, the total amount of pain medication administered by different nurses and ordered by different doctors would have been apparent. Dr. Koch testified that he treated post-PEG insertion patients about once a week and that the amount of pain medication prescribed to Chesser "is substantially more than what I - - I have ever seen." Chesser's medical records demonstrated that he received a Duragesic patch and continued to receive repeated doses of morphine. Nurse Moore conceded that Chesser's medical chart reflected inconsistent pain assessments recorded at different places in Chesser's medical chart.[22] Nurse Moore testified that as the Director of Nursing, she was satisfied with this documentation.[23] Higgenbotham and Dr. Koch testified that had a nursing care plan been implemented for Chesser, doctors then would have had enough information to know to investigate an underlying cause of Chesser's pain. They explained that as reflected in LMS's policies, the main purpose of a care plan is to document care, to provide for continuity of care, and to establish priorities for care.

Higgenbotham testified repeatedly that although LMS was responsible for

---

[22]For example, in Chesser's medical records for November 20, 2004, one page shows that he reported his pain as a 10 at 12:30 p.m., another page shows that he reported his pain as a 1 at 12:10 p.m., and yet another page shows that he reported his pain as a 4 at 12:30 p.m.

[23]Moore also conceded that Chesser's medical records documented that he received physical therapy and safety awareness on November 22 when in fact Chesser was transferred to Harris Hospital on the evening of November 20.

formulating the policies and procedures for Hospital, LMS wholly failed to institute any mechanism to ensure that the policies and procedures it implemented were actually followed at and utilized by Hospital. Finally, Higgenbotham explained, "And again, in LMS's policies and procedures, they mimic what's in the Nurse Practice Act and the rules and regulations and what's in the Federal regulations. But then when you go and examine the records, they're not doing it."

LMS's controverting evidence concerning its negligence and proximate cause included the following: Nurse Smith's testimony that a care plan was not necessary in order for a doctor or a nurse to give appropriate care; Nurse Smith's testimony that she was qualified and had taken a test establishing her competency to assist in the performance of PEG procedures prior to Chesser's procedure; Nurse Moore's testimony that nurses follow orders given by doctors and that the nurses did that in caring for Chesser; expert Dorothy Ellford, R.N.'s testimony that LMS was not negligent; and Nurse Moore's testimony that Chesser's records adequately showed that the nurses addressed all problems he experienced as they arose.

### 5. Application of Legal Sufficiency Standard of Review

Crediting the evidence favorable to the jury's finding that LMS's negligence proximately caused Chesser's injuries, disregarding evidence contrary to the finding because a reasonable factfinder assessing the credibility of the witnesses could, and applying the definitions provided in the court's charge, the evidence is legally sufficient to establish that LMS's negligence was a proximate cause of

36

Chesser's injuries. *See City of Keller*, 168 S.W.3d at 827. That is, the evidence is legally sufficient to support the jury's finding that LMS failed to use ordinary care by failing to do that which a long-term acute care hospital management company of ordinary prudence would have done under the same or similar circumstances. LMS, a management company "morally and legally" responsible by virtue of written governing board bylaws for "*outcomes of all service provided to its patients*," failed to generate policies and procedures governing the care of patients post-PEG tube insertion, failed to draft or implement job descriptions for nurses working in the procedure room and performing or assisting in PEG tube procedures or any other procedures, and failed to check or monitor that Hospital in fact used or implemented any of the policies and procedures generated by LMS.

Dr. Koch testified that all of Chesser's injuries were attributable to the too-tight bolster around his PEG tube and that all of Chesser's injuries could have been avoided if only the bolster had been loosened on November 16, 17, or 18. Higgenbotham and Dr. Koch testified, and Nurse Smith conceded, that despite policies requiring a care plan for every patient and despite Nurse Smith's job description requiring a care plan for every patient, no nursing care plan existed for Chesser after the PEG tube was inserted. Higgenbotham and Dr. Koch testified that a care plan for Chesser would have documented and alerted doctors to his severe pain. Dr. Koch explained that the doctors took appropriate action on Chesser's behalf based on what was discernable from his medical

37

records and in the absence of a care plan.  This evidence is sufficient to enable reasonable and fair-minded people to reach the conclusion that it was more likely than not that LMS's failure to generate policies and procedures governing care of patients post-PEG tube insertion, failure to draft or implement a job description for nurses working in the procedure room and performing or assisting in PEG tube procedures, and failure to check or monitor that Hospital in fact used or implemented any of the policies and procedures generated by LMS, including the policies requiring a nursing care plan for every patient, caused the tightness of Chesser's PEG bolster to go unexamined and unaddressed, leading in a continuous sequence to all of his injuries.[24]  The jury could reasonably have concluded that LMS's negligence was shown by a preponderance of the evidence to be a substantial factor in bringing about Chesser's injuries stemming from the too-tight bolster and that if LMS had not been negligent, the bolster's tightness either would not have occurred or would have been checked and discovered either via a post-PEG tube insertion patient care policy, via a policy

---

[24]We have addressed Chesser's three primary theories of negligence by LMS, and the evidence is legally sufficient to support the jury's proximate cause finding concerning all three theories of negligence.  We note, however, that we are required to affirm the judgment on the jury's verdict on this issue if the evidence is legally sufficient concerning any one of these theories of negligence that LMS proximately caused Chesser's injuries.  *Accord Dillard v. Tex. Elec. Coop.*, 157 S.W.3d 429, 434 (Tex. 2005) (explaining that jurors could unanimously find negligence even if they based their finding on different negligent acts); *Wackenhut Corr. Corp. v. de la Rosa*, 305 S.W.3d 594, 622 (Tex. App.—Corpus Christi 2009, no pet.) (explaining that evidence is sufficient to support yes answer to broad-form negligence submission if any of the alleged negligent acts is supported by sufficient evidence).

concerning the role and supervision of nurses in the procedure room, or via a properly instituted and maintained care plan documenting Chesser's continued post-PEG tube insertion pain.[25] *See Park Place Hosp.*, 909 S.W.2d at 511; *see also Marvelli*, 100 S.W.3d at 470.

### 6. Application of Factual Sufficiency Standard of Review

Likewise, viewing all of the evidence, the evidence supporting the jury's finding in question 1 that LMS's negligence was a proximate cause of Chesser's injuries is not so weak, nor is the evidence to the contrary so overwhelming, that the jury's answer should be set aside and a new trial ordered. *See Garza*, 395 S.W.2d at 823. Indeed, Appellees do not point to specific evidence as constituting overwhelming contrary evidence concerning proximate cause. Instead, without a factual sufficiency analysis, in one sentence Appellees assert alternatively that not only does less than a scintilla of evidence support the jury's finding that LMS was negligent, but also that the evidence and inferences supporting the finding are so weak or that some unidentified evidence to the contrary is so overwhelming that this court should reverse and remand for a new trial. We have carefully reviewed the entire record in detail, and we hold that the evidence supporting the jury's answer to question 1 finding LMS negligent is not

---

[25]The jury was also instructed that there can be more than one proximate cause of an event, and the jury found more than one proximate cause because they also found Hospital's negligence proximately caused Chesser's injuries.

so weak nor the contrary evidence so overwhelming that a new trial is required.

We overrule Appellees' second issue.

## V.  CHARGE ERROR

In their first and third issues, respectively, Appellees argue that the trial court erred by refusing to submit a charge instruction on unavoidable accident and by submitting an erroneous definition of joint enterprise.

### A.  No Error in Refusing to Submit Unavoidable Accident Instruction

In their first issue, Appellees argue that the trial court abused its discretion by refusing to submit an unavoidable accident instruction.  Appellees contend that "the complications Mr. Chesser suffered (including infection, hemorrhage, migration or dislodgement of the tube, erosion and injury to organs) are recognized complications of the PEG tube procedure and are complications that may occur without anyone's negligence."  [Internal record citations omitted.] Appellees also contend that Chesser's pre-existing conditions—diabetic neuropathy and cerebrovascular disease—could have been a cause of his injuries, entitling Appellees to an unavoidable accident instruction.

An unavoidable accident "is an event not proximately caused by the negligence of any party to it."  *Reinhart v. Young*, 906 S.W.2d 471, 472 (Tex. 1995) (quoting *Dallas Ry. & Terminal Co. v. Bailey*, 250 S.W.2d 379, 385 (Tex. 1952)); *Young v. Thota*, 271 S.W.3d 822, 836–37 (Tex. App.—Fort Worth 2008, pet. denied).  The purpose of an unavoidable-accident instruction is to

advise the jurors, in the appropriate case, that they do not have to

40

place blame on a party to the suit if the evidence shows that conditions beyond the party's control caused the accident in question or that the conduct of some person not a party to the litigation caused it.

*Dillard*, 157 S.W.3d at 432 (citing *Reinhart*, 906 S.W.2d at 472). An unavoidable accident instruction thus submits a defendant's inferential rebuttal defense—a defense that operates to rebut an essential element of the plaintiff's case by proof of other facts. *Id.* The instruction is most often used to inquire about the causal effect of some physical condition or circumstance such as fog, snow, sleet, wet or slick pavement, or obstruction of view or to resolve a case involving a very young child who is legally incapable of negligence. *Reinhart*, 906 S.W.2d at 472. It is within the trial court's discretion to submit an unavoidable accident instruction when the evidence supports the conclusion that no one was negligent. *Accord In re V.L.K.*, 24 S.W.3d 338, 340 (Tex. 2000) (explaining that trial court's decision to submit or to refuse a particular jury instruction is reviewed under an abuse of discretion standard); *La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998) (recognizing that trial courts have great latitude and considerable discretion to determine necessary and proper jury instructions).

Here, although the trial court did not submit an unavoidable accident instruction, a "bad result" instruction was submitted. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.303(e)(2) (West 2011) (requiring this instruction in all health care liability claims filed after September 1, 2003 and tried to a jury); *see also* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges:*

41

*Malpractice, Premises, Products* PJC 50.7 (2006). The bad result instruction informed the jury that "[a] finding of negligence may not be based solely on evidence of a bad result to Curtis Paul Chesser, but a bad result may be considered by you, along with other evidence, in determining the issue of negligence. You are the sole judges of the weight, if any, to be given to this kind of evidence." Tex. Civ. Prac. & Rem. Code Ann. § 74.303(e)(2). The bad result instruction, by telling the jury that it could not base a finding of negligence solely on evidence of a bad result, adequately submitted Appellees' theories that the complications Chesser suffered (including infection, hemorrhage, migration or dislodgement of the tube, and erosion and injury to organs) are recognized complications of the PEG tube procedure and are complications that may occur without anyone's negligence and that Chesser's injuries could have been caused by his pre-existing conditions. *Accord Dillard*, 157 S.W.3d at 432 (explaining that instead of examining whether evidence existed to support submission of multiple instructions, "we think it more appropriate to examine the adequacy of the charge that was given"). That is, the bad result instruction sufficiently informed the jury that it could believe that Chesser simply had a bad result with the PEG tube or that the bad result could have been caused by his pre-existing conditions and instructed the jury that a bad result alone would not support a negligence finding against Appellees. *See id.* at 430 (explaining that unavoidable accident instruction sufficiently informed jury of and submitted defendant's sole proximate cause inferential rebuttal defense that fatal auto accident was not caused by

42

defendant's negligence but by presence of cattle on the roadway); *Williams v. Viswanathan*, 64 S.W.3d 624, 628–29 (Tex. App.—Amarillo 2001, no pet.) (holding that evidence existed to support bad result instruction when doctor admitted that patient's care worsened under his care but denied that he was negligent). Looking to the adequacy of the charge given, because the bad result instruction sufficiently informed the jury that it could not find Appellees negligent solely based on a bad result suffered by Chesser from the PEG tube or from his pre-existing conditions, the trial court did not abuse its discretion by refusing to also submit an unavoidable accident instruction. *See Dillard*, 157 S.W.3d at 434 (explaining that redundancy created by submission of multiple inferential rebuttal instructions is contrary to the spirit of broad-form submission); *V.L.K.*, 24 S.W.3d at 341 (recognizing that trial court possesses considerable discretion to determine necessary and proper jury instructions). The bad result instruction submitted in this case, based on these facts, adequately informed the jury about Appellees' theories that the complications Chesser suffered (including infection, hemorrhage, migration or dislodgement of the tube, and erosion and injury to organs) are recognized complications of the PEG tube procedure and are complications that may occur without anyone's negligence and that Chesser's injuries could have been caused by his pre-existing conditions, which were not the fault of anyone; Appellees were entitled to nothing more. *See Dillard*, 157 S.W.3d at 434.

We overrule Appellees' first issue.

## B. Alleged Error in Definition of Joint Enterprise Submitted in Question 6

In their third issue, Appellees argue that the trial court erred by submitting, over Appellees' objection and timely tender of a requested definition, a legally incorrect definition of joint enterprise in connection with question 6 in the court's charge. The court's charge contained the following definition of joint enterprise:

> A "joint enterprise" exists if the persons concerned have (1) an agreement, either express or implied, with respect to the enterprise or endeavor; (2) a common purpose; (3) a community of pecuniary interest in the common purpose of the enterprise among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

Appellees requested, tendered, and objected to the trial court's refusal to submit the following definition of joint enterprise:

> A "joint enterprise" exists if (1) individuals or entities are parties to an agreement, either express or implied, (2) a common purpose *to be carried out by the group*; (3) a community of pecuniary interest in the common purpose of the enterprise among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. [Emphasis added.]

Appellees complain on appeal that the exclusion of the language italicized above—"to be carried out by the group"—from the definition of joint enterprise constituted error and harmed Appellees.

Because, as set forth above, we have sustained Appellees' fourth issue challenging the legal sufficiency of the evidence to support the third element of a joint enterprise—the community-of-pecuniary-interest-in-the-common-purpose-of-the-enterprise element—we need not address whether the failure to include the "to be carried out by the group" language in the second element of the joint

44

enterprise definition submitted to the jury constituted error. The definition requested and the definition submitted are identical with respect to the third element of a joint enterprise, and therefore, under either definition, the evidence is legally insufficient to support the jury's affirmative finding as to this third element. Accordingly, we need not and do not address Appellees' third issue. *See* Tex. R. App. P. 47.1 (requiring appellate court to address only issues necessary to final disposition of the appeal).

## VI. ALLEGED ERRORS IN JUDGMENT

In their fifth issue, Appellees allege in four subparts that four specific errors exist in the trial court's judgment: three subparts assert erroneous application of statutory provisions, and one subpart asserts an abuse of discretion by the trial court. We address these contentions individually below applying the rules of statutory construction and the abuse of discretion standard of review, as dictated by the error alleged.

## A. Noneconomic Damages

In their fifth issue, subpart A, Appellees argue that they are entitled to limit their combined civil liability for noneconomic damages to $250,000 pursuant to civil practice and remedies code section 74.301(b). *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.301(b) (West 2011). Section 74.301 provides, in its entirety:

### § 74.301.  Limitation on Noneconomic Damages

(a)  In an action on a health care liability claim where final judgment is rendered against a physician or health care provider other than a health care institution, the limit of civil liability for noneconomic

45

damages of the physician or health care provider other than a health care institution, inclusive of all persons and entities for which vicarious liability theories may apply, shall be limited to an amount not to exceed $250,000 for each claimant, regardless of the number of defendant physicians or health care providers other than a health care institution against whom the claim is asserted or the number of separate causes of action on which the claim is based.

(b)  In an action on a health care liability claim where final judgment is rendered against a single health care institution, the limit of civil liability for noneconomic damages inclusive of all persons and entities for which vicarious liability theories may apply, shall be limited to an amount not to exceed $250,000 for each claimant.

(c)  In an action on a health care liability claim where final judgment is rendered against more than one health care institution, the limit of civil liability for noneconomic damages for each health care institution, inclusive of all persons and entities for which vicarious liability theories may apply, shall be limited to an amount not to exceed $250,000 for each claimant and the limit of civil liability for noneconomic damages for all health care institutions, inclusive of all persons and entities for which vicarious liability theories may apply, shall be limited to an amount not to exceed $500,000 for each claimant.

*Id.* § 74.301.  Under chapter 74 of the civil practice and remedies code, the definition of a "health care institution" specifically includes a "hospital." *Id.* § 74.001(a)(11)(G) (West 2011).  And a health care institution is specifically included within the definition of a "health care provider." *Id*. § 74.001(a)(12)(A)(vii).  Finally, a manager of a health care provider is also defined as a health care provider. *Id.* § 74.001(a)(12)(B)(i).

Utilizing these definitions prescribed by the legislature in section 74.001, because Hospital is a hospital, it is a health care institution. *See id.* § 74.001(a)(11)(G).  As a healthcare institution, Hospital is also a health care

46

provider. *Id*. § 74.001(a)(12)(A)(vii). And LMS, as the manager of health care provider Hospital is itself a health care provider. *Id.* § 74.001(a)(12)(B)(i). The judgment in this case was entered against Hospital and LMS. Thus, the judgment here was entered against a health care institution (Hospital) and against a health care provider (LMS).

Given these prescribed definitions and their application to Appellees, and inserting those applications into the plain language of section 74.301's limitation on noneconomic damages provisions, it is clear that both subsection (a) and subsection (b) apply to this judgment, triggering the two separate damage caps set forth individually in subsection (a) and subsection (b), and that subsection (c) does not apply to this judgment. Subsection (a) applies when a final judgment is rendered against a health care provider other than a health care institution; that is, subsection (a) applies to health-care-provider LMS but not to health-care-institution Hospital. Subsection (b) applies when a final judgment is rendered against a single health care institution; so subsection (b) applies here because Hospital is the only, the single, health care institution against which the judgment here was entered. Subsection (c) applies only when final judgment is rendered against more than one health care institution; subsection (c) does not apply here because the judgment does not render judgment against more than one health care institution—Appellee Hospital is the sole health care institution against whom judgment was rendered.

Having determined that section 74.301, subsections (a) and (b) are both

47

applicable to the present judgment, we next examine the limitation on noneconomic damages contained in each subsection. Subsection (a) limits the noneconomic damages liability of a health care provider, other than a health care institution, "inclusive of all persons and entities for which vicarious liability theories may apply," to $250,000 for each claimant regardless of the number of defendant health care providers, other than a health care institution, against whom the claim is asserted or the number of separate causes of action on which the claim is based. *Id*. § 74.301(a). Thus, here, subsection (a) limits the noneconomic damages liability of health-care-provider LMS (but does not apply to health-care-institution Hospital) to $250,000. *See id*. Subsection (b) limits the noneconomic damages liability of a health care institution that is the only health care institution against whom final judgment is rendered to an amount not to exceed $250,000 for each claimant inclusive of all persons and entities for which vicarious liability theories may apply. *Id*. § 74.301(b). Thus, here, subsection (b) limits the noneconomic damages liability of health-care-institution Hospital (as the single health care institution against whom judgment was rendered) to $250,000. *See id*. Both subsections (a) and (b) apply to the judgment at issue here, limiting separately the noneconomic damages civil liability of both LMS and Hospital to $250,000 each.

Appellees nonetheless contend that because—in addition to the direct liability theories of recovery that Chesser pleaded against LMS—Chesser pleaded that LMS was vicariously liable for Hospital's negligence and that a joint

enterprise existed between LMS and Hospital, the vicarious liability limitation of subsection (a) applies. That is, Appellees contend that because Chesser pleaded that LMS was vicariously liable for Hospital's negligence and pleaded that a joint enterprise existed between Appellees, and because subsection (a) provides that health-care-provider LMS's limit of liability for nonecomomic damages is "inclusive of all persons and entities for which vicarious liability theories may apply," including Hospital's here, only subsection (a) applies to the judgment here. We could hypothesize about various fact patterns and scenarios under which Appellees' argument might have some traction. This situation, however, is not one of them.

First, here, as set forth above, the evidence is legally insufficient to support the jury's joint enterprise finding. Subsection (a)'s vicarious liability language therefore cannot apply to Hospital based on a joint enterprise theory of vicarious liability. Second, also as set forth above, the instructions and definitions given to the jury in connection with the negligence question, question 2, submitted to the jury only the issue of LMS's and Hospital's direct liability.[26] The jury did not make any other fact finding that would support the imposition of vicarious liability on

[26]Recall that negligence as to LMS was defined as the

failure to use ordinary care, that is, failing to do that which a long-term acute care hospital management company of ordinary prudence would have done under the same or similar circumstances or doing that which a long-term acute care hospital management company of ordinary prudence would not have done under the same or similar circumstances.

LMS for Hospital's breach of its direct duties to Chesser. *See, e.g.*, *St. Joseph Hosp.*, 94 S.W.3d at 537–38 (discussing various theories of vicarious liability); *accord Obstetrical & Gynecological Assocs., P.A. v. McCoy*, 283 S.W.3d 96, 105 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (recognizing that purely vicarious liability claim against entity, as opposed to direct liability claim, did not require expert report in addition to report filed regarding doctor employed by entity). Thus, absent some fact finding that would support imposition of vicarious liability on LMS for Hospital's direct liability to Chesser, the plain language of section 74.301(a)'s "inclusive of all persons and entities for which vicarious liability theories may apply" provision cannot be applicable to impose vicarious liability on LMS for Hospital's direct liability to Chesser.

We overrule subpart A of Appellees' fifth issue.

### B. Prejudgment Interest

In subpart C of their fifth issue, Appellees contend that the trial court erred by awarding prejudgment interest on past noneconomic damages. Appellees do not challenge any aspect of the computation of prejudgment interest; their sole argument is that because the noneconomic damages awarded by the jury exceeded the statutory noneconomic damages limit of $250,000 set forth in section 74.301, prejudgment interest is not available. That is, Appellees contend that section 74.301's $250,000 limit on their civil liability for noneconomic damages is inclusive of prejudgment interest on past noneconomic damages.

As authority for their position, Appellees cite section 74.002 of the civil

50

practice and remedies code and *Molinet v. Kimbrell*, No. 09-0544, 2011 WL 182230 (Tex. Jan. 21, 2011). Section 74.002 states that, and *Molinet* stands for the proposition that, in the event of a conflict between a provision of chapter 74 of the civil practice and remedies code and any other statute, rule of procedure, or rule of evidence, chapter 74 trumps. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.002(a) ("In the event of a conflict between this chapter and another law, including a rule of procedure or evidence, or court rule, this chapter controls to the extent of the conflict."); *Molinet*, 2011 WL 182230, at *5–6 (holding that the limitations provisions of section 74.251(a) and section 33.004(e) conflict and that section 74.251(a) prevails). Appellees claim that section 74.301's $250,000 limitations on civil liability for noneconomic damages conflicts with finance code sections 304.102 and 304.1045 authorizing prejudgment interest on past damages in a personal injury action.[27] *See* Tex. Fin. Code Ann. §§ 304.102, .1045 (West 2006) (providing that a judgment in a personal injury case earns prejudgment interest on past damages).

Section 74.301 limits civil liability for noneconomic damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.301. "Noneconomic damages" is defined in chapter 74 as having "the meaning assigned by section 41.001."

---

[27]Appellees contend that "Mr. Chesser is entitled to recover prejudgment interest on past damages, pursuant to section 304.102 and 304.1045 of the Texas Finance Code. However, prejudgment interest on the award of past noneconomic damages should be included within the $250,000 cap contained in section 74.301 of the Civil Practice & Remedies Code."

51

*Id*. § 74.001(a)(20). Section 41.001 defines noneconomic damages as

> damages awarded for the purpose of compensating a claimant for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than exemplary damages.

*Id*. § 41.001(12) (West 2008). Section 41.001 also defines economic damages as "compensatory damages intended to compensate a claimant for actual economic or pecuniary loss; the term does not include exemplary damages or noneconomic damages." *Id*. § 41.001(4).

Prejudgment interest is a form of damages recognized in Texas law to compensate a claimant for economic or pecuniary loss: for lost use of money. *Columbia Hosp. Corp. of Houston v. Moore*, 92 S.W.3d 470, 472 (Tex. 2002); *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985), *abrogated on other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 533 (Tex. 1998); *Shook v. Walden*, 304 S.W.3d 910, 927 (Tex. App.—Austin 2010, no pet.) (explaining that the award of prejudgment interest as damages derived from the concept that a judgment debtor wrongfully deprives the judgment creditor of the amount of damages ultimately awarded in the judgment between the time the damages accrue and the date of judgment). Thus, prejudgment interest does not and cannot fall within section 41.001's definition of noneconomic damages; instead, prejudgment interest falls within section 41.001's definition of economic damages because it is

a form of damages recognized in Texas law and intended to compensate for economic or pecuniary loss suffered by a claimant for loss of use of money. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(4). Because, as economic damages, prejudgment interest is specifically excluded from section 41.001's definition of noneconomic damages, it likewise does not fall within chapter 74's definition of noneconomic damages. *See* §§ 41.001(4), .001(12), 74.001(a)(20).

Giving chapter 74 supremacy over the finance code, looking first and foremost to the words of section 74.301 and utilizing the definitions prescribed by the legislature in section 74.001, prejudgment interest does not fall within the statutory definition of noneconomic damages—which are the only damages limited by section 74.301. *See* Tex. Gov't Code Ann. § 311.011(b) (requiring us in statutory construction to apply definitions provided by the legislature); *Lexington Ins. Co.*, 209 S.W.3d at 85 (instructing that to give effect to legislature's intent "we look first and foremost to the words of the statute"). Because prejudgment interest is pecuniary in nature, because it does not fall within the definition of noneconomic damages provided by the legislature in chapter 74, and because section 74.301's plain language limits only civil liability for noneconomic damages, we hold that prejudgment interest is not included in section 74.301's limit on civil liability for noneconomic damages and that section 74.301 in no way conflicts with finance code sections 304.102 or 304.1045. And because Appellees make no complaint concerning the amount or computation of prejudgment interest, we overrule subpart C of Appellees' fifth issue.

## C. Joint and Several Liability

In subpart B of their fifth issue, Appellees alternatively contend that, to the extent the noneconomic damage caps of both section 74.301(a) and (b) apply to the judgment here, nonetheless Appellees cannot be jointly and severally liable for imposition of the two $250,000 noneconomic damage awards.[28] A defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility unless the percentage of responsibility attributed to the defendant is greater than 50% or the defendant engaged in particular conduct listed in the penal code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.013(a), (b) (West 2008). Here, the jury found LMS 30% responsible and found Hospital 60% responsible. Based on our above holding that legally insufficient evidence exists to support the jury's joint enterprise finding and the fact that the jury assessed only 30% responsibility against LMS, LMS cannot be jointly and severally liable with Hospital for the entire judgment. *See id*.; *Able*, 35 S.W.3d at 616 (recognizing that "each party in a joint enterprise is responsible for the negligent act of the other"); *Shoemaker*, 513 S.W.2d at 14 (same). Consequently, we sustain subpart B of Appellees' fifth issue to the extent that it complains of LMS's joint and several liability with Hospital for the

---

[28]Our discussion and analysis is limited in applicability to only cases, like this one, in which the total noneconomic damages awarded by the jury were in excess of both of the $250,000 caps and in excess of the $500,000 combined total of both applicable caps; the jury here awarded $1,725,000 in noneconomic damages.

$250,000 statutorily-limited noneconomic damages award against Hospital under section 74.301(b).

We next address whether Hospital (as a 60% responsible, jointly and severally liable defendant under section 33.013(b)(1)) can be liable (by virtue of joint and several liability) for the $250,000 noneconomic damages awarded pursuant to section 74.301(a) against LMS in the judgment. We hold that it cannot. The plain language of section 74.301(a) and (b) is to limit the civil liability of the entities described in those subsections to $250,000 for noneconomic damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.301(a), (b). Although we found Appellees' reliance on section 74.002 of the civil practice and remedies code and *Molinet v. Kimbrell* inapplicable to our statutory analysis concerning the statutory language and definitions concerning prejudgment interest, these authorities do apply here to our analysis of whether the imposition of joint and several liability on Hospital for the $250,000 noneconomic damages awarded against LMS is prohibited by section 74.301(b).

As we previously mentioned, section 74.002 states that, and *Molinet* stands for the proposition that, in the event of a conflict between a provision of chapter 74 of the civil practice and remedies code and any other statute, rule of procedure, or rule of evidence, chapter 74 trumps. *See id.* § 74.002(a); *Molinet*, 2011 WL 182230, at *5–6. Here, Texas Civil Practice and Remedies Code section 33.013(b)(1)'s imposition of joint and several liability on all defendants found to be greater than 50% responsible for capped noneconomic damages

attributable to another defendant conflicts with section 74.301's limitation of civil liability for noneconomic damages owed by a health care institution like Hospital. Section 33.013(b)(1) provides that each liable defendant is, in addition to being responsible for the percentage of damages in accordance with the percentage of responsibility assessed against that defendant by the jury, also "jointly and severally liable for the damages recoverable by the claimant" if "the percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent." Tex. Civ. Prac. & Rem. Code Ann. § 33.013(b)(1). On the other hand, section 74.301(b) provides that "[i]n an action on a health care liability claim where final judgment is rendered against a single health care institution, the limit of civil liability for noneconomic damages . . . shall be limited to an amount not to exceed $250,000." *Id.* § 74.301(b). Thus, to the extent that section 33.013(b)(1) may statutorily make a health care liability defendant "jointly and severally [civilly] liable" for noneconomic damages in excess of the $250,000 cap on "civil liability" for noneconomic damages applicable to that health care liability defendant under either section 74.301(a) or 74.301(b), the two statutes conflict. When another statute conflicts with a provision of chapter 74, chapter 74's provision trumps. *See id.* § 74.002(a); *Molinet*, 2011 WL 182230, at *5–6.[29]

---

[29]Chesser argues that because a jointly and severally liable defendant possesses a right of contribution, the statutory provisions at issue do not conflict. A right of contribution, however, presupposes that the defendant has actually paid the damages—that is, has already been civilly liable—for noneconomic damages in excess of the $250,000 cap applicable to that defendant, in violation of the express language of section 74.301(b). *See* Tex. Civ. Prac. & Rem. Code

Section 74.301(b) also prevails over section 33.013(b)(1) to the extent of any conflict between the two in a particular case because section 74.301 is more recently enacted than section 33.013(b)(1) and is also more specific than section 33.013(b)(1).  *See* Tex. Gov't Code Ann. §§ 311.025(a), .026; *Horizon/CMS Healthcare Corp.*, 34 S.W.3d at 901.  We hold that section 74.301(b) prevails over section 33.013(b)(1) when, as in this case, the statutes conflict.  We sustain this portion of subpart B of Appellees' fifth issue.  We modify the judgment to delete Hospital's joint and several liability for the $250,000 noneconomic damages awarded against LMS.[30]

## D.  Specific Annuity Ordered

In subpart D of their fifth issue, Appellees argue that the trial court abused its discretion by ordering a specific annuity to fund periodic payments for Chesser's future medical expenses.  Prior to trial, Appellees filed a "Conditional Request for Periodic Payments of Future Damages of LifeCare Defendants." Appellees requested that in the event either or both of them were found liable for future damages, including future loss of earnings, that the trial court order such damages be paid in whole or in part by periodic payments rather than by a lump

---

Ann. § 33.015(a), (b) (West 2008) (recognizing in both subsections a right of contribution when a defendant has paid a percentage of damages greater than his percentage of responsibility).

[30]Appellees concede that Hospital remains jointly and severally liable for the entire judgment, excluding the $250,000 noneconomic damages attributable to LMS pursuant to section 74.301(a).

sum payment.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.503(b) (West 2011) (providing that on motion of defendant or claimant the trial court may order future damages other than medical, health care, or custodial services to be paid in whole or in part in periodic payments).

Appellees did not limit their request that future damages be funded by periodic payments to funding utilizing a particular entity.  Instead, after the jury returned its verdict, Chesser and Appellees began investigating annuity options for periodic payment of future damages.  At a hearing before the court, Chesser proposed various options funded through American General Life Insurance Company.  Appellees likewise proposed various periodic payment options funded through American General Life Insurance Company.  Ultimately, the final judgment signed by the trial court requires Appellees to

> assign their obligations for the period payments to American General Annuity Service Corporation, which will be funded through the purchase of an annuity policy from American General Life Insurance Company, funded with $550,000, payments to Plaintiff monthly, tax free, guaranteed for the life of Curtis Paul Chesser with 119 months installment refund period.

> Section 74.505(b) of the civil practice and remedies code provides:

> (b)  The judgment must provide for payments to be funded by:

>> (1)  an annuity contract issued by a company licensed to do business as an insurance company, including an assignment within the meaning of Section 130, Internal Revenue Code of 1986, as amended;

>> (2)  an obligation of the United States;

>> (3)  applicable and collectible liability insurance from one or

58

more qualified insurers; or

> (4)  any other satisfactory form of funding approved by the court.

*Id.* § 74.505(b) (West 2011); *see also id*. § 74.503(d) (setting forth other information that must be included in the judgment when periodic payments of future damages are ordered).

On appeal, Appellees claim that the entirety of section 74.505, titled "Financial Responsibility," is inapplicable to the judgment here; they claim that section 74.505 applies only when a defendant requesting periodic payments of future damages is not adequately insured.  Consequently, Appellees argue on appeal that the trial court abused its discretion by including the information required by section 74.505(b) in the judgment.  But in the trial court, Appellees argued that section 74.505(c), requiring that "on termination of periodic payment of future damages, the court shall order the return of the security, or as much as remains, to the defendant" was applicable to the judgment here; Appellees requested that language to this effect be included in the judgment, and the judgment includes the requested language.[31]   *Id*. § 74.505(c).   Because

---

[31]At the hearing held on Appellees' motion requesting periodic payment of future damages, Appellees' counsel argued,

[Appellees' counsel]:  There is also 74.505(c) that the periodic payment money must be returned to the defendants.  I think the judgment has to - - to provide for that upon the death of the plaintiff.

THE COURT:  Where are you - -

59

Appellees asserted in the trial court that section 74.505 applied to the judgment and requested that language from section 74.505(c) be included in the judgment, and because such language was included in the judgment, Appellees cannot now claim on appeal that section 74.505 does not apply to the judgment or that the trial court abused its discretion by applying section 74.505 to the judgment. *See, e.g.*, *In re Dep't of Family & Protective Servs.*, 273 S.W.3d 637, 646 (Tex. 2009) (explaining that the invited error doctrine applies to situations in which a party requests the court to make a specific ruling, then complains of that ruling on appeal); *Ne. Tex. Motor Lines v. Hodges*, 138 Tex. 280, 283, 158 S.W.2d 487, 488 (1942) (explaining that a party cannot complain on appeal that the trial court took a specific action that the complaining party requested).

In any event, the trial court did not abuse its discretion by including language in the judgment that required Appellees to

> assign their obligations for the period payments to American General Annuity Service Corporation, which will be funded through the purchase of an annuity policy from American General Life Insurance

---

[Appellees' counsel]: I'm - - I'm citing section - -

THE COURT: No. I understand. I'm just wondering where - -

[Appellees' counsel]: Somewhere in the judgment I think there needs to be a provision there that provides for that.

[Chesser's counsel]: 74. - -

[Appellees' counsel]: –505(c).

Company, funded with $550,000, payments to Plaintiff monthly, tax free, guaranteed for the life of Curtis Paul Chesser with 119 months installment refund period.

*See Low*, 221 S.W.3d at 614 (explaining that a trial court abuses its discretion if it acts arbitrarily and unreasonably without reference to guiding principles). The trial court was authorized by section 74.505(b) and section 74.503(c) and (d) to include such language in the judgment. We hold that the trial court did not abuse its discretion by including the above quoted language in the judgment. Moreover, we hold that Appellees waived any complaint about the application of section 74.505 to the judgment because they requested the application of section 74.505(c) to the judgment in the trial court.

We overrule subpart D of Appellees' fifth issue.

## VII. Conclusion

Having sustained Chesser's sole issue, we reverse that portion of the trial court's judgment applying a 10% percentage-of-responsibility settlement credit of $377,383.50. We modify the trial court's judgment by changing the settlement credit amount from a 10% percentage-of-responsibility settlement credit of $377,383.50 to a dollar-for-dollar settlement credit of $183,000. We render judgment accordingly.

Having sustained Subpart B of the fifth issue of Appellees LifeCare Management Services, L.L.C. (LMS) and LifeCare Hospitals of North Texas, L.P. d/b/a LifeCare Hospital of Fort Worth (Hospital), we reverse that portion of the trial court's judgment subjecting both Hospital and LMS to civil liability for the two

61

capped $250,000 noneconomic damage awards. We modify the judgment by imposing several liability on Hospital and LMS for the capped $250,000 noneconomic damages award attributable to each.

Having sustained Hospital and LMS's sixth issue, we reverse the portion of the trial court's judgment imposing joint and several liability upon LMS for the entire judgment. We modify the trial court's judgment so that in addition to being severally liable for $250,000 in noneconomic damages plus prejudgment and postjudgment interest on that amount, LifeCare Management Services is severally liable for only 30% of the judgment (excluding Hospital's $250,000 noneconomic damage civil liability). We render judgment against LMS accordingly.

Having addressed all of the issues necessary to the disposition of this appeal that were raised in Chesser's appeal and in Hospital and LMS's cross appeal, and having, pursuant to Texas Rule of Appellate Procedure 43.2(a),(b) and (c), reversed the trial court's judgment in part, rendered the trial court's judgment in part, and modified the trial court's judgment in part, we affirm the remainder of the trial court's judgment as modified.

SUE WALKER
JUSTICE

PANEL: WALKER, MCCOY, and MEIER, JJ.

DELIVERED: August 31, 2011