

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-11-00115-CV
_____


SAMMY BURCHINAL AND ASHLEY BURCHINAL, Appellants

V.

PJ TRAILERS-SEMINOLE MANAGEMENT COMPANY, LLC;
TEXMECANA MANAGEMENT, LLC; AND
PJ TRAILERS MANUFACTURING, INC., Appellees

On Appeal from the 62nd Judicial District Court
Lamar County, Texas
Trial Court No. 78163


Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

Twenty-seven-year-old Sammy Burchinal was employed by Texmecana Management, LLC (Texmecana), as a truck driver. Among his duties was to deliver trailers which had been manufactured by PJ Trailers Manufacturing, Inc. (Manufacturing), and loaded by it onto flatbed haulers owned by Texmecana. On March 21 or 22, 2007, Sammy drove from Texas to California to deliver a load of Manufacturing's trailers (which had been stacked atop one another on the flatbed) to California Custom Trailers, Inc. (CCT). The cross-country trip was a "smooth and easy drive." However, a forklift operator under the direction of CCT experienced difficulty during the unloading process, causing a trailer to topple off and crash to the ground near where Sammy was standing. On March 28, 2007, Sammy filled out an employee statement of injury claiming that he was "standing watching trailers unloading" and sustained a "lower back" injury when he "got out of the way of a falling trailer."

Although Sammy originally filed suit by himself, claiming for damages he maintained that he had sustained, he was eventually joined in the suit by his wife, Ashley, for derivative damages arising from Sammy's injuries. The ultimate basis of the lawsuit was an allegation that the damages had been sustained because the trailers had been negligently stacked on the flatbed, causing one of them to topple when CCT attempted to remove it from the flatbed. The Burchinals appeal the grant of a motion for summary judgment entered in favor of Texmecana, PJ Trailers-Seminole Management Company, LLC (Seminole), and Manufacturing.[1] We find that (1) the claims against Manufacturing were barred by the statute of limitations; (2) the

---

[1]Seminole and Manufacturing are collectively referred to as "PJ Trailers."

evidence failed to raise a fact issue that Texmecana, Seminole, and Manufacturing were operating as a joint enterprise or as alter egos of one another; (3) the evidence did not raise a genuine issue of material fact with respect to negligence claims against Texmecana or Seminole; and (4) Ashley's derivative claims fail as a matter of law. Accordingly, we affirm the trial court's judgment.

## I. Standard of Review

The function of a summary judgment is not to deprive a litigant of the right to a full hearing on the merits of any real issue, but to eliminate patently unmeritorious claims and untenable defenses. *See Gulbenkian v. Penn*, 252 S.W.2d 929, 931 (Tex. 1952). When reviewing a traditional summary judgment, we take as true all evidence favorable to the Burchinals and indulge every reasonable inference and resolve any doubts in their favor. *Limestone Prods. Distribution*, *Inc. v. McNamara*, 71 S.W.3d 308, 311 (Tex. 2002); *Rhone–Poulenc*, *Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). On appeal, PJ Trailers must show that there is no material fact issue and that they are entitled to judgment as a matter of law based upon the limitations defense. *McNamara*, 71 S.W.3d at 311; *Steel*, 997 S.W.2d at 223; *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671 (Tex. 1979).

A no-evidence summary judgment is essentially a pretrial directed verdict. *Seidler v. Morgan*, 277 S.W.3d 549, 552 (Tex. App.—Texarkana 2009, pet. denied). Therefore, we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Wal–Mart Stores*, *Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002). In this no-evidence summary judgment, Texmecana and PJ Trailers represented that no

3

evidence existed as to one or more essential elements of the Burchinals' claims, upon which they would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Seidler*, 277 S.W.3d at 552. The Burchinals were then required to present evidence raising a genuine issue of material fact on the challenged elements. *Seidler*, 277 S.W.3d at 552. To defeat a no-evidence motion for summary judgment, they were not required to marshal their proof; their response needed only point out evidence that raised a fact issue on the challenged elements. *Id.*

We must determine whether the Burchinals produced any evidence of probative force to raise a fact issue on the material questions presented. *Id.* at 552–53 (citing *Woodruff v. Wright*, 51 S.W.3d 727 (Tex. App.—Texarkana 2001, pet. denied)). The Burchinals will defeat a no-evidence summary judgment motion if they presented more than a scintilla of probative evidence on each element of their claim. *Id.* at 553 (citing *King Ranch*, *Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)).

In our review, we consider all the summary judgment evidence in the light most favorable to the Burchinals, disregarding all contrary evidence and inferences. *Id.*; *Merrell Dow Pharms.*, *Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). Where, as here, a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed if any of the theories advanced are meritorious. *See Hyde v. Hoerauf*, 337 S.W.3d 431, 434 (Tex. App.—Texarkana 2011, no pet.) (citing *Star-Telegram*, *Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995)).

## II.    Factual and Procedural History

The interrelationship between Texmecana, Manufacturing, and Seminole is critical to an understanding of the issues. PJ Trailers manufactures and sells custom-made trailers throughout the United States. After the trailers are manufactured, they are loaded onto a flatbed, stacked one atop the other so that multiple trailers can be delivered in a single haul. The ownership of the flatbed "depends on who contracts to haul that order." Shipping options include "Texmecana, hired trucks, [and] contract carriers."

Once the carrier's flatbed is in place on PJ Trailers' property, the trailers are loaded on top of one another by four to six "stackers" and a crane operator, all of whom are employed by Manufacturing. In order to keep the trailers balanced, secure, and free from damage, stackers cut wooden boards and use the boards and trailer tires to level the load. Because PJ Trailers is a custom operation, the manner in which loads are stacked varies, and there are no written standards in place for stackers. Rather, stackers undergo a two-week training period, and each loading is coordinated by a stacking bay supervisor who personally inspects each flatbed before it goes out.

At that point, the driver of the truck pulling the loaded flatbed has the responsibility of strapping the loaded trailers to the flatbed using driver-owned straps or chains. In addition to written guidelines drivers receive instructing them how the load should be strapped down, they are encouraged to communicate with the stacking bay supervisor. Once on the road, the drivers report to dispatchers employed by PJ Trailers.

5

Sammy filed his original petition a few days prior to the expiration of the statute of limitations, naming only Texmecana and Seminole as defendants. The factual portion of the petition recited:

> Plaintiff was a truck driver and in the course and scope of his employment was required to deliver trailers manufactured by Defendants to purchasers. On March 22, 2007, Mr. Burchinal was watching a trailer being unloaded when he had to jump out of the way of a forklift that came crashing from the back of a nearby trailer. The forklift had not been properly secured by Defendants' employees. Defendants' failure to properly train its employees created an unnecessary safety hazard that severely injured Mr. Burchinal.

The sole cause of action for negligence claimed:

> Defendants were guilty of the following acts of negligence:
>
> a. Failing to properly train its employees on how to safely secure a forklift on a trailer;
> b. Failing to act as a reasonable employer would under the same or similar circumstances;
> c. Failing to provide Plaintiff with the proper, safe, and well maintained equipment and materials to perform his job duties in a safe manner;
> d. Directing Plaintiff to work with unsafe equipment;
> e. Failing to provide Plaintiff with a safe work environment; and
> f. Failing to instruct or train Plaintiff on proper safety procedures.

It is uncontested that the California forklift operator was not employed by or in any manner affiliated with Texmecana, Seminole, or Manufacturing.

A few days after the statute of limitations expired, Sammy filed an amended petition on March 24, 2009, including Ashley as a party. The petition was substantively identical to the original petition, with the exception of the addition of loss of consortium and loss of household services asserted by Ashley.

6

Seminole[2] was "voluntarily dissolved in 2008." On June 19, 2009, it filed responses to the Burchinals' requests for disclosure, listing California Custom Trailers (CCT) as a potential party based upon the factual assertions and claims in the original and amended petitions. Despite Sammy's belief that he was an employee of PJ Trailers, Seminole denied in responses to interrogatories filed August 24, 2009, that it had an employment relationship with Sammy.

On September 22, 2009, Seminole and the Burchinals entered into a Rule 11 agreement because "it wasn't an accident that occurred on [Seminole's] premises, [and] they weren't the employer:"

> You represent that PJ Trailers-Seminole Management Company, L.L.C. ("PJ-Seminole") should have no involvement in this matter. Further, you represent that Mr. Burchinal, in the above referenced case, was at no time an employee or agent of PJ Seminole. Further, you agree that if I file a Motion to Dismiss PJ Seminole Without Prejudice and at some later date it is determined that PJ Seminole is a proper party to this lawsuit, you will waive all statute of limitation defenses arising out of or as a result of the dismissal.

Seminole was dismissed without prejudice October 2, 2009, pursuant to the Burchinals' motion.

With Texmecana still involved in the lawsuit, Sammy's deposition was taken March 9, 2010. He testified that he was supposed to watch the unloading process

> because of PJ's got into deals to where the dealers were damaging trailers and scratching them as they were unloading them or whatever, and then they were calling PJ's and telling them, you know: This is how this trailer arrived here; it was done in stacking or whatever, when they knew it wasn't.

Next, he described the incident in a manner different from the original petition. When Sammy arrived at CCT, he

---

[2]There was a distribution center in Seminole, Texas.

unchained everything and waited around, not very long. And you have got to stand there beside the trailer while they unload you. And they was working -- I believe it was the first trailer or the second trailer -- I can't remember -- you know, off the top of the stack, and they just set it down on these boards.

And whenever they stuck the forklift up underneath there he seen it wasn't in the center of it. Well, then he scooted over. That one board that PJ's put in there was blocking him from picking it up level there and he had to move over. And he just did the best he can with what he had to work with because of the way it was stacked on there.

. . . .

When he went to pick it up the boards and everything went sliding with it that it was setting on, and then when it come off it come at me.

Although he knew the forklift operator was experiencing difficulty in attempting to remove the trailer using different strategies, Sammy stood close to the flatbed upon which it and the other trailers were stacked. Sammy was not concerned because he "figured that's [the operator's] job." The forklift operator's efforts to remove the trailer without damaging it were unsuccessful, and the trailer being removed fell off the stacked trailers toward the place where Sammy was standing. Sammy turned to run and "didn't get far until [the trailer] hit the ground behind [him]." Afterward, Sammy called dispatcher Judd Oates to "let them know what happened, you know, that a trailer hit the ground and all that." He did not inform Oates that he had been injured because he "didn't figure" he was. Sammy experienced no pain "until after I left and the adrenaline wore off. That's when I figured: Okay. I just pulled my back or whatever. It will go away. And it just kept getting worse." He testified, "If they would have stacked it right [the operator] wouldn't have had this problem and it wouldn't have fell [sic] off."

8

Following depositions of the Burchinals and Sammy's supervisor, Abe Wall, a second amended petition was filed June 16, 2010, reinstating claims against Seminole in addition to the claims against Texmecana. The factual portions of this petition were amended as follows:

6. . . . . On or about March 22, 2007, Mr. Burchinal was delivering a load of trailers to a customer site. The trailers were loaded on to Plaintiff's truck at Defendants' business and by Defendants' employees. The trailers were stacked upon one another on the bed of Plaintiff's truck, and were separated and balanced by beams of wood, which had been provided by Defendants and put in place by employees of Defendants known as "stackers" prior to transit.

7. Upon arriving at the customer site, Plaintiff was required by his job duties to observe the unloading of trailers from his truck by employees of the customer for whom the delivery was made. This practice was put in place, at least in part, to ensure that the delivered trailers had not been damaged during transit and were being delivered to the customer in pristine condition. As Plaintiff was watching a forklift operator attempt to remove the top trailers off from the stack, he noticed that the operator was having difficulty maneuvering the forks of his lift into a proper and balanced position underneath the trailers, due to the improper placement of the wooden stacking beams. As the unbalanced load was being removed, a stacked trailer shifted appearing it would fall towards Plaintiff. Plaintiff was injured when he had to suddenly dash out of the way of the falling trailer. The trailers had not been properly stacked by Defendants' employees. Defendants' failure to properly train their employees to load trailers in a reasonable manner created an unnecessary safety hazard that severely injured Mr. Burchinal.

In line with Sammy's deposition, the focus of the petition was the falling trailer as opposed to the forklift and the failure to properly stack the load instead of failure to secure the forklift on the trailer.

On August 26, 2010, Texmecana filed a no-evidence motion for summary judgment arguing that Seminole was no longer a party to the suit and there was no evidence of Ashley's

9

claims, medical causation, or that Texmecana (who only hired truck drivers) was negligent because it was not responsible for the stackers' acts or omissions.

The following month, the Burchinals filed a third amended petition listing Manufacturing for the first time, in addition to Seminole and Texmecana. While the factual portion of the petition remained the same as in the second amended petition, claims of joint enterprise and *res ipsa loquitur* were added. A fourth amended petition added the theory of single business enterprise.

Texmecana supplemented its motion for summary judgment to respond to joint enterprise claims and pointed out that Manufacturing was not added to the lawsuit until after the expiration of the statute of limitations. Manufacturing and Seminole also filed a no-evidence motion for summary judgment, in addition to a traditional motion for summary judgment based upon the defense of limitations.

The trial court ultimately granted both motions for summary judgment.[3] On appeal, the Burchinals complain that the trial court erred because they produced more than a scintilla of evidence on their joint enterprise theory and each element of negligence, demonstrated *res ipsa loquitur*, and proved that misidentification tolled the statute of limitations as to Manufacturing. We begin our analysis with the statute of limitations issue.

---

[3]The trial court had granted Texmecana's motion to dismiss earlier in the proceedings, but withdrew its first order to give the Burchinals an additional forty-five days to "complete any additional discovery and attach any pertinent exhibits to [their] . . . Response of Motion for Summary Judgment."

**III.	Manufacturing Proved Its Entitlement to Summary Judgment on its Statute of Limitations Defense**

It is uncontested that Manufacturing was not sued within the two-year window.[4] Therefore, it was the Burchinals' burden to bring "forth summary judgment evidence raising a genuine issue of material fact regarding the application of some legal theory in avoidance of limitations." *Cooper v. D & D G.C. of Gilmer, Inc.*, 187 S.W.3d 717, 720 (Tex. App.—Tyler 2006, no pet.); *Maher v. Herrman*, 69 S.W.3d 332, 338 (Tex. App.—Fort Worth 2002, pet. denied) ("to prevent summary judgment in a misidentification case, a plaintiff must plead and prove by the summary judgment evidence the proper defendant was not prejudiced by the mistake in pleading"). The Burchinals contend: they sued Seminole within the two-year period; Seminole waived the statute of limitations claims as set forth in the Rule 11 agreement, and; limitations as to Manufacturing had tolled due to misidentification.

Ordinarily, "'an amended pleading adding a new party does not relate back to the original pleading' to determine whether it is timely to avoid limitations." *Noland v. Hughes*, 349 S.W.3d 209, 212 (Tex. App.—Dallas 2011, no pet.) (quoting *Univ. of Tex. Health Sci. Ctr. at San Antonio v. Bailey*, 332 S.W.3d 395, 400 (Tex. 2011)). "Misnomer[5] is an exception, misidentification is a more limited one." *Id.* (quoting *Bailey*, 332 S.W.3d at 400). "Misidentification occurs when two separate legal entities with similar names actually exist, and

---

[4]Sammy's negligence claims were subject to the two-year statute of limitations, which expired March 22, 2009. TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) (West Supp. 2011).

[5]A misnomer is when a plaintiff merely misnames a correct defendant. In misnomer cases, limitations is tolled and subsequent amendment of the pleading relates back to the date of the original petition. *Maher*, 69 S.W.3d at 338. The Burchinals do not raise any arguments of misnomer.

the plaintiff sues the wrong entity by mistake." *Cooper*, 187 S.W.3d at 720. As a general rule, misidentification does not toll limitations. *Maher*, 69 S.W.3d at 338. The consequence of this error is "generally harsh." *In re Greater Houston Orthopaedic Specialists*, *Inc.*, 295 S.W.3d 323, 325 (Tex. 2009) (orig. proceeding) (per curiam). Tolling will not occur where a "plaintiff sues an incorrect entity [unless] (1) there are two separate but related entities that use a similar trade name,[6] (2) the correct entity had notice of the suit, . . . (3) the correct entity was not misled or disadvantaged by the plaintiff's mistake," and (4) the incorrect entity and correct entity have a business relationship. *Cooper*, 187 S.W.3d at 720 (citing *Chilkewitz*, 22 S.W.3d at 830); *Cont'l So. Lines*, *Inc. v. Hilland*,[7] 528 S.W.2d 828 (Tex. 1975); *Palmer v. Enserch Corp.*, 728 S.W.2d

---

[6]We find that this requirement removes Texmecana from the analysis.

[7]The Burchinals cite to *Hilland*, which specified the requirements for tolling of the limitations period in misidentification cases. 528 S.W.2d 828. In that case, Hilland purchased a bus ticket in Houston, Texas, bearing the name Continental Trailways, went to a bus station with the same name, and boarded a bus also marked Continental Trailways. *Id.* at 829. The side of the bus contained one-inch lettering conveying the information that the bus was owned by "Continental Southern Lines, Inc.," but Hilland did not see this lettering. *Id.* Hilland was injured while stepping off this bus. *Id.* She brought suit within the statute of limitations against Continental Trailways, Inc., a Texas corporation (Texas). *Id.*

Texas was a different corporation with different officers and directors from Continental Southern Lines, Inc., the Louisiana corporation (Louisiana) who owned the bus. *Id.* Continental Trailways was merely a trade name used by a number of separate bus corporations, and Louisiana was listed on Hilland's ticket as one of twenty-six corporations all doing business as "Continental Trailways, Dallas, Texas." *Id.* Texas was not one of those corporations. In fact, it had no equipment, buses, or terminals, transported no passengers, and its sole purpose was to preserve the trade name. *Id.*

Upon discovering these facts after the statute of limitations had run, Hilland amended her petition to add Louisiana. Louisiana asserted the statute of limitations defense based upon the general rule

> that a suit must be 'commenced and prosecuted' against a party to be held liable within two years from the date of the act which causes the injury. And generally, the institution of suit against one corporation will not interrupt the running of the limitation period as to a different corporation or entity. *Stokes v. Beaumont, Sour Lake & W. Ry.*, 339 S.W.2d 877 (Tex. 1960).

*Id.* at 829. The *Hilland* court concluded that the bus companies "made a conscious effort to make it appear to the public and to their customers" that they were Continental Trailways. *Id.* at 830. Given the confusion, the court wrote:

431, 433 (Tex. App.—Austin 1987, writ ref'd n.r.e.). To toll limitations, the defendants must be shown to have had notice of the suit within the limitations period. *Cooper*, 187 S.W.3d at 720 (citing *Hilland*, 528 S.W.2d at 831). "Waiver of application of the statute is especially compelling when the corporate defendants have reasonably similar names which might cause confusion, and when the "proper" defendant encourages or acquiesces in the answer filed by the improper defendant." *Palmer*, 728 S.W.2d at 433.

The Burchinals and Manufacturing both argue that notice is the key issue. The Burchinals claim Manufacturing knew it was the proper party and was not misled or disadvantaged by the mistake in pleading.[8] They point to the incident report Sammy filled out for human relations/safety manager, Martha Ortiz-Collard, who identified herself as an employee

---

The primary purpose of a statute of limitations is to compel the exercise of a right within a reasonable time so that the opposite party has a fair opportunity to defend while witnesses are available and the evidence is fresh in their minds. While the plaintiff made a mistake in her original petition as to the defendant that should have been sued, it is our opinion that she should be given, under the circumstances here present, an opportunity to prove that [Louisiana], was cognizant of the facts, was not misled, or placed at a disadvantage in obtaining relevant evidence to defend the suit.

*Id.* at 831. It also recited that the driver of the bus filled out an accident report with Louisiana, and the two corporations had the same agent for service, the same attorneys in the area, and some indication that service of citation was forwarded to Louisiana, all facts relating to the suggestion of notice. *Id.* at 830–31. With these facts in mind, the court remanded the case in order to allow the trial court to determine whether Louisiana was put on notice of Hilland's claims within the limitations period in spite of the misidentification. The Burchinals argue, based on *Hilland*, that PJ Trailers had common counsel, common employees, etc. However, unlike *Hilland*, the claims filed by the plaintiff did not morph. PJ Trailers acknowledges that they may have had notice of something before the limitations period, but did not have notice of any claims asserted *against them* for which they would have responsibility prior to the limitations period.

[8]In support of this theory, the Burchinals cited to Seminole's response to requests for disclosure that "PJ Trailers-Seminole Management Company, LLC is the correct name for the date of the alleged incident; however, PJ Trailers Manufacturing Co., Inc., is the correct name currently." This contention, which the record indicates may not have been correct since Seminole was dissolved, was made after the limitations period.

13

of Manufacturing, and contend that Manufacturing had notice that Sammy injured his back while "get[ting] out of the way of [a] falling trailer," and did not suffer prejudice from the late filing.

PJ Trailers responds there was no suggestion that either Seminole or Manufacturing was responsible for the claims asserted in the original petition under which the Rule 11 agreement was made.[9] The original petition pointed only to negligence of the forklift operator or to Sammy's employer, Texmecana. PJ Trailers argued that the Burchinals essentially filed a new lawsuit in their amended petitions based upon different factual allegations. As argued at the summary judgment hearing, "the operative facts in existence, crashing forklift in California, not improper stacking in Texas. Completely different operative facts." Thus, according to PJ Trailers, the Rule 11 agreement signed by Seminole did not toll limitations for Manufacturing,[10] who was sued outside of limitations.

> As we have stated in *Pierson v. SMS Financial II*, *L.L.C.*,
>
> the main distinction between misidentification and misnomer is whether the correct party received notice of the suit. The main reason that the statute of limitations is tolled in cases of misnomer is that the party intended to be sued has been served and put on notice that he is the intended defendant.

959 S.W.2d 343, 347 (Tex. App.—Texarkana 1998, no pet.) (citations omitted). The cases cited by the Burchinals involve situations where notice of the suit would necessarily put the defendant on notice that it could be the proper party. The language of the original petition here focuses on the forklift operator. In this circumstance, we find that even if Manufacturing had notice of the

---

[9]Also, Manufacturing denied that it received copies of the original petition or copies of citation addressed either to Texmecana or Seminole.

[10]The record in this case does not answer the question of what authority Seminole had, if any, to bind Manufacturing, who had not yet been made a party to the suit.

14

original petition, it would not be put on notice that it was the intended defendant; thus, it could not be considered the "correct entity" or proper defendant under the original petition because this petition did not allege that Manufacturing committed any tortious act.[11] We conclude that the general rule that misidentification does not toll the statute of limitations applies, as opposed to its narrow exception. The trial court properly granted summary judgment in favor of Manufacturing on the statute of limitations issue.

## IV. The Burchinals Did Not Raise a Genuine Issue of Material Fact on Joint Enterprise and Alter Ego Theories

PJ Trailers and Texmecana are affiliated companies. The Burchinals argue that there is some evidence that Texmecana, Seminole, and Management were engaged in a joint enterprise to acquire, manufacture, sell, and deliver trailers for the use and benefit of the Thiesen family and that these businesses were possibly alter egos of one another. The Burchinals argue that the corporate veils should be pierced and conclude that these entities are in reality a single entity with a single purpose. The Burchinals believe that by suing Texmecana and Seminole, they simultaneously sued Manufacturing, avoiding the statute of limitations issue.

---

[11]Rule 16.068 of the Texas Civil Practice and Remedies Code states:

> If a filed pleading relates to a cause of action, cross action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.

TEX. CIV. PRAC. & REM. CODE ANN. § 16.068 (West 2008). As in *Maher*, we may not look to this rule in deciding this issue since it was not presented to the trial court. *Maher*, 69 S.W.3d at 339. We are "confine[d] . . . to the misidentification doctrine." *Id.*

## A.    Relevant Facts

Sammy initially believed he worked for both Texmecana and PJ Trailers, which is why his medical records and health insurance claim forms reflect the names of both companies. This confusion may have been warranted. Texmecana policy manuals contained the statement "[y]ou can take great pride in being a part of PJ's labor force." The Burchinals' bank statements reflect automated clearinghouse deposits (ACH) made by "P.J. Trailers—Payroll" as early as 2006. Collard identified herself as an employee of PJ Trailers Manufacturing Company, but admitted that she acted as "HR" for Texmecana without pay because they did not have "an HR person." She used Texmecana letterhead in correspondence relating to this incident. Further, responses to requests for disclosure and answers to interrogatories by Texmecana, Seminole, and Manufacturing list Collard as the human relations manager and custodian of records for all of the entities.

Although Texmecana and PJ Trailers are affiliated companies, Wall testified there were several shipping options for the trailers, which included "Texmecana, hired trucks, [and] contract carriers." Sammy testified that in addition to hauling trailers for PJ Trailers, he hauled army equipment, pipe, steel, lumber, hay, and farm equipment for other companies. Wall stated that Texmecana flatbeds were housed or stored at PJ Trailers' facilities. He explained, "There's two different offices, but it's all the same group," comprised of a shipping office and main office. Responses to requests for admission admitted that Manufacturing and Texmecana had the same physical address. Collard testified that Texmecana and PJ Trailers had separate insurance policies for injured employees.

In day-to-day operations, the Texmecana driver would be required to report to PJ Trailer dispatchers, and were required to get permission from them if they had to "go out of [their] route for any reason." Wall responded, "Yes" when asked if "it [would] be a fair statement to say that in terms of being told where to go and what to do and pretty much every aspect of his job, a driver for Texmecana is being supervised and managed by a PJ employee." Collard also testified that Texmecana drivers were directed by "a PJ employee," and minutes of meetings demonstrated that regular communication between drivers and dispatchers was not only encouraged, it was required in cases of accident. While PJ Trailers did not have safety policies for Texmecana drivers, the drivers had Texmecana safety meetings, written Texmecana policies relating to reporting accidents and personal injuries, and were required to follow Department of Transportation policies. If a driver was faced with issues regarding miles driven and receipts, which impacted their pay scale, they were instructed to contact Wall.

Texmecana, Seminole, and Manufacturing denied that they were under common ownership.[12] Wall testified that Peter Thiesen and the Thiesen family owned PJ Trailers at the time of the incident. Collard testified Frank Thiesen, as the manager of Texmecana, made direct assignments to Texmecana employees. Collard identified the president and CEO of Texmecana and "PJ's" as Doug Clark, who had an office "on the facility," but did not make assignments to Texmecana employees. Clark was Manufacturing's agent for service of process while Jake Thiesen was Seminole's and Texmecana's agent for service of process. Collard next testified that she had not heard of Seminole or PJ Management Company, but recalled a distribution

---

[12]The Burchinals point out that Seminole and Texmecana were represented by the same counsel at one point.

center for "PJ's" in Seminole. Although she was unsure, Collard "assumed that the Thiesen family owned it" and that she would have been the recipient of any reports of personal injury from Seminole.

### B. Joint Enterprise

"Joint enterprise is a theory involving derivative liability whereby one enterprise participant may be held responsible for a cause of action proven against another participant." *In re Tex. Dep't of Transp.*, 218 S.W.3d 74, 78 (Tex. 2007) (orig. proceeding) (per curiam) (citing *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 611–16 (Tex. 2000)). Texas has adopted the restatement standard, finding that the elements which are essential to a joint enterprise are: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. *Seidler*, 277 S.W.3d at 556 (citing *Able*, 35 S.W.3d at 613). Evidence of shared officers, directors, employees, business addresses, and assets are insufficient to demonstrate joint enterprise where the other requirements are left unmet. *Chesser v. Lifecare Mgmt. Servs.*, *L.L.C.*, 356 S.W.3d 613, 626 (Tex. App.—Fort Worth 2011, no pet.).

With respect to the second element, the Burchinals argue, and we agree, that the evidence creates a fact issue as to whether the entities have the common purpose of manufacturing and delivering custom built trailers. However, analysis of the remaining elements determines that summary judgment was proper.

18

As in *Seidler,* we find that "the summary judgment evidence contains no written agreements among these parties, and there is no direct evidence of such an agreement. The evidence pointed to by [the Burchinals] consists of no more than the commonality of officers in the entities, with suggestions that we should ascribe some sinister motive thereto," and shared business addresses. 277 S.W.3d at 556.

With respect to community of pecuniary interest, "[t]he mere existence of monetary benefits to both [entities] by virtue of their relationship is insufficient to establish the third element of a joint enterprise." *Chesser*, 356 S.W.3d at 626. "[E]vidence must exist of a monetary interest in the enterprise common to each member of the enterprise; the monetary interest of each member of the group in the enterprise must be 'shared without special or distinguishing characteristics.'" *Id.* at 625 (quoting *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 531 (Tex. 2002)). While the payroll was sent by ACH deposit by PJ Trailers, there is no evidence suggesting that Texmecana, Seminole, and Manufacturing shared monetary interest without special or distinguishing characteristics. Moreover, an indirect, potential financial interest is insufficient. *Wolff*, 94 S.W.3d at 532.[13]

As to the last requirement, Texmecana argues there is no evidence suggesting it, as the company who only hired drivers, had an equal right to a voice in the direction of the enterprise, which gave it an equal right of control. The factor requires an authoritative voice, some right to do more than make suggestions that could be adopted or rejected. *Triplex Commc'ns*, *Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995). The Burchinals argue that the fact that members of the

---

[13]Manufacturing denied that it filed consolidated balance sheets or tax returns with Seminole in response to requests for admission.

19

Thiesen family owned the different entities was sufficient to raise a fact issue as to this element. However, "[w]here one party has overriding control over another, a joint enterprise does not exist." *N. Am. Van Lines*, *Inc. v. Emmons*, 50 S.W.3d 103, 117 (Tex. App.—Beaumont 2001, pet. denied). We conclude no fact issue was raised with respect to joint right of control.

The Burchinals failed to raise a genuine issue of material fact with respect to their joint enterprise theory.

## C.  Disregarding the Corporate Fiction

Next, the Burchinals believe that alter ego should be applied to this case. Alter ego is one basis for piercing the corporate veil and disregarding the corporate fiction. *Seidler*, 277 S.W.3d at 557; *Pinebrook Props.*, *Ltd. v. Brookhaven Lake Prop. Owners Ass'n*, 77 S.W.3d 487, 499 (Tex. App.—Texarkana 2002, pet. denied) (citing *Castleberry v. Branscum*,[14] 721 S.W.2d 270, 272 (Tex. 1986)). It applies "when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *Pinebrook Props.*, 77 S.W.2d at 499 (quoting *Castleberry*, 721 S.W.2d at 272); *see SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444 (Tex. 2008). "Failure to comply with corporate formalities is no longer a factor in considering whether alter ego exists." *Pinebrook Props.*, 77 S.W.3d at 499 (citing TEX. BUS. CORP. ACT ANN. art. 2.21(A)(3); *see Aluminum Chems. (Bolivia)*, *Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 67 (Tex. App.—Texarkana 2000, no pet.)). "The burden to prove alter ego rests upon the party who is arguing that the two

---

[14]*Castleberry* has been limited by statute. *See* TEX. BUS. CORP. ACT ANN. art. 2.21(A)(2), (3) (*recodified* effective January 1, 2006, at TEX. BUS. ORGS. CODE ANN. § 21.223 by Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 267, 427).

parties are actually one entity."  *Seidler*, 227 S.W.3d at 558 (citing *BMC Software Belgium*, *N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002)).

The Texas Supreme Court has set forth when regarding entities as alter egos is appropriate:

> A subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders. On the other hand where management and operations are assimilated to the extent that the subsidiary is simply a name or conduit through which the parent conducts its business, the corporate fiction may be disregarded to prevent fraud or injustice.

*Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex. 1975); *see also Marchand*, 83 S.W.3d at 799.

The facts argued by the Burchinals which they cite as support for applying alter ego are reminiscent of the following factors considered when employing the single business enterprise theory:  (1) common employees; (2) common offices; (3) centralized accounting; (4) payment of wages by one corporation to another corporation's employees; (5) common business name; (6) services rendered by the employees of one corporation on behalf of another corporation; (7) undocumented transfers of funds between corporations; and (8) unclear allocation of profits and losses between corporations.  *See Hoffmann v. Dandurand*, 180 S.W.3d 340, 348 (Tex. App.—Dallas 2005, no pet.).  The Texas Supreme Court completely rejected the single-business entity doctrine as a valid mechanism for piercing the corporate veil and imposing liability in Texas in *SSP Partners* when it wrote:

> The "single business enterprise" liability theory . . . does not entail the level of agreement required for joint enterprise liability or the abuse required before the

21

law disregards the corporate structure to impose liability. The theory . . . applies whenever two corporations coordinate operations and combine resources in pursuit of the same business purpose. We have never approved of imposing joint liability on separate entities merely because they were part of a single business enterprise, and we have pointed out that an issue exists "whether a theory of 'single business enterprise' is a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure."

275 S.W.3d at 452 (footnotes omitted); *see Big Easy Cajun Corp. v. Dallas Galleria Ltd.*, 293

S.W.3d 345, 347 (Tex. App.—Dallas 2009, pet. denied). [15]

---

[15]All alter ego cases cited by the Burchinals predate *SSP Partners* and do not address the additional requirement of actual fraud as discussed in that case and as contemplated by Section 21.223 of Texas Business Organizations Code, which provides:

> (a)      A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to:
>
> . . . .
>
> (2)      any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory; or
>
> (3)      any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality, including the failure to:
>
> > (A)      comply with this code or the certificate of formation or bylaws of the corporation; or
> >
> > (B)      observe any requirement prescribed by this code or the certificate of formation or bylaws of the corporation for acts to be taken by the corporation or its directors or shareholders.

Rather, alter ego "is shown from the total dealings of the corporation and the individual, including the degree to which . . . corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Pinebrook Props.*, 77 S.W.3d at 499 (quoting *Castleberry*, 721 S.W.2d at 272). Evidence as proof of an alter ego includes: (1) the payment of alleged corporate debts with personal checks or other commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for the individual's personal use; (4) inadequate capitalization; and (5) other failure to keep corporate and personal assets separate. *See Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 229 (Tex. 1990). This type of evidence was not included as summary judgment evidence. Accordingly, Texmecana, Seminole, and Manufacturing were entitled to summary judgment in their favor on the Burchinals' alter ego theory as a matter of law.

Also, *SSP Partners* reminds:

> Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace. We have never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances. There must also be evidence of abuse, or as we said in *Castleberry*, injustice and inequity.

---

(b)     Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

(West Supp. 2011).

23

275 S.W.3d at 455. Thus, "the relationship between two entities" is one consideration to disregarding the corporate form, "[t]he other consideration is whether the entities' use of limited liability was legitimate." *Id*. There was no evidence raising a fact question with respect to this requirement, either.

We find that the Burchinals did not create a fact issue with respect to alter ego.

**V.    No-Evidence Summary Judgment on Negligence Claim Was Proper**

To survive a no-evidence summary judgment on the negligence claim, the Burchinals were required to present more than a scintilla of evidence demonstrating the existence of a legal duty, a breach of that duty, and damages that were proximately caused by the breach. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). The two elements of proximate cause are cause-in-fact and foreseeability. *Id*. (citing *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002)). Both elements of proximate cause are required and were challenged in this case. *Id*.; *Lopez-Juarez v. Kelly*, 348 S.W.3d 10, 28 (Tex. App.—Texarkana 2011, pet. denied).

"Cause-in-fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Kelley*, 348 S.W.3d at 28. Foreseeability requires that "the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen." *Hickman v. Am. Pawn & Jewelry, Inc.*, 972 S.W.2d 144, 147 (Tex. App.—Texarkana 1998, no pet.).

24

## A. Texmecana bore no duty to warn of a commonly-known hazard

Texmecana argued that no assertion of direct negligence could be made against it with respect to improper stacking since stackers were all PJ Trailer employees. It also maintains that there was no evidence of a policy requiring Sammy to stand close to a forklift to observe the unloading process which would create a duty between Texmecana and Sammy.

The Burchinals argued that Texmecana breached a duty to provide a safe working environment by delegating it to PJ Trailers "when it directed Mr. Burchinal to work according to PJ Trailers['] instructions and with the unsafe equipment (improperly stacked load)." Sammy testified "PJ's" had a policy requiring him to "stand there to make sure" the trailer was not damaged.

PJ Trailers' human relations and safety manager, Collard, testified that she was unaware of any instructions requiring drivers to observe the unloading process. Wall testified, "I'm not aware of a policy that somebody is to stand there and observe" the unloading of the trailers. He pointed out that a customer is liable for unloading trailers and would thus be responsible for damages occasioned by a trailer falling during the unloading process. While the Burchinals' brief stated, "Texmecana breached its duty when it directed Mr. Burchinal to work according to PJ Trailers['] instructions," Sammy did not testify whether Texmecana was aware of these instructions or whether the instructions required Sammy to stand in close proximity to the load.[16]

While Sammy's testimony created a fact issue as to whether he was required to observe the unloading, it did not specify from what proximity or vantage point that observation must take

---

[16]Moreover, Sammy's testimony did not provide more than a scintilla of evidence on the claim of failing to provide a safe work environment.

place. "An employer . . . is not an insurer of its employees' safety." *Aleman v. Ben E. Keith Co.*, 227 S.W.3d 304, 311 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006); *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996)). Sammy testified he was standing "up here beside the back axle" of the flatbed while the trailers were being unloaded. "An employer owes no duty to warn of hazards that are commonly known or already appreciated by the employee." *Id.* We find that Texmecana had no duty to warn Sammy not to stand under or dangerously close to a trailer while it is being unloaded after he observed the forklift driver was having difficulty balancing the load, as it would be a commonly known hazard.

The Burchinals also asserted that Texmecana failed to provide a safe working environment in directing Sammy to work with an unbalanced, and thus, unsafe load. However, as explained below, the Burchinals failed to provide more than a scintilla of evidence that the load of trailers was unbalanced or unsafe. Therefore, summary judgment against Texmecana was proper.

### B. There was no evidence of breach of a standard of care with respect to Seminole

With respect to avoidance of the statute of limitations via the misidentification doctrine, the Burchinals argued that Manufacturing was the correct entity which should have been sued. Whereas Seminole was a distribution center in another location, Manufacturing was the entity that claimed the stackers as its employees.[17] We have determined that claims against

---

[17]On appeal, PJ Trailers argued that the risk utility test, commonly used in products liability cases, suggested no duty was owed. This argument was not made to the trial court. Summary judgment cannot be affirmed on grounds not

Manufacturing were not timely asserted and note that the Burchinals do not specifically suggest that Seminole was the entity that employed the stackers.

Out of an abundance of caution, and because Collard and Wall failed to specify which entity employed the stackers in their testimony, we address Seminole's argument that there was no evidence of the standard of care or evidence demonstrating that any negligent stacking occurred.[18]

The Burchinals argue that *res ipsa loquitur* establishes that negligence occurred because an "improperly stacked load" fell toward Sammy. "*Res ipsa loquitur*, meaning 'the thing speaks for itself,' is an evidentiary rule applied when the circumstances surrounding an accident are sufficient to support an inference of negligence." *Traut v. Beaty*, 75 S.W.3d 661, 664 (Tex. App.—Texarkana 2002, no pet.). It is not a separate cause of action. It applies to situations in which two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence, and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. *Id.* (citing *Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex. 1990)). Also, it applies only when the "defendant's negligence is probable." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 604 (Tex. 2004). "The possibility of other causes does not have to be completely eliminated, but their likelihood must be so reduced that the jury can reasonably find by a preponderance of the evidence that the negligence, if any, lies at the defendant's door." *Id.*

---

expressly presented in the summary judgment motion, answer, or other response. *Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex. 1993); *see* TEX. R. CIV. P. 166a(c) (motion for summary judgment must "state the specific grounds therefor" and the issues must be "expressly set out in the motion").

[18]We view the evidence in light most favorable to the Burchinals.

27

We find that the Burchinals have not successfully invoked the doctrine of *res ipsa loquitur*. Because the load was balanced during transit, and there is no allegation to the contrary, it is difficult for the Burchinals to argue that the likelihood of negligence of the forklift operator was so reduced that a reasonable jury could find that the negligence lay with Seminole. Even if the first element of *res ipsa* was met, the instrumentality causing the injury was the forklift, which was in CCT's control. Moreover, *res ipsa loquitur* may not be applied in those circumstances when the use of the instrumentality is not within common knowledge of laymen. *See Haddock*, 793 S.W.2d at 950.

Thus, the Burchinals were required to raise more than a scintilla of evidence on the issue of breach of the standard of care. They claim:

> Mr. Burchinal was in a position to see and witnessed first-hand the difficulty the forklift operator had in navigating the stacking blocks. Mr. Burchinal therefore provided testimony as a fact witness regarding what he actually observed; he was not merely speculating or offering unsubstantiated conclusions. Further, Appellants argue that a layman is capable of observing whether or not a stack of trailers is balanced. From a child's see-saw to a game of Jenga, the average individual has the experience and know-how to make a visual determination as to whether or not something is in balance . . . .

Wall testified there is a standard policy that trailers are required to be separated from each other during the stacking process. Sammy testified that "they are going to stick boards on top of [the trailer] in order not to scratch up the floor or the paint or whatever. And they are going to stick boards in there until -- wherever they can get them at to make it level or right or whatever." Sammy testified the loads are "all stacked different," he was "not an expert on stacking," and "did not see [the board] placed there." The load would have been stacked

28

according to a stacking bay supervisor, who would have approved the load prior to Sammy's pick-up. Sammy surmised that the forklift operator was having difficulty and that "right there where them boards were at is where [the prongs of the forklift] needed to be." He indicated that the placement of the boards was interfering with the forklift operator's ability to balance the trailer prior to removing it from the flatbed. However, absent further evidence, negligent stacking cannot be assumed, as Sammy experienced no issues with regard to the balancing of the load until external forces of the forklift were applied. Importantly, there was no testimony suggesting that the load could have been balanced without the placement of the board at issue.[19] We conclude that Sammy's testimony did not amount to more than a scintilla of evidence of breach of the stacking standard of care (assuming that standard of care was identified and established or was what a reasonable stacker would do under the same or similar circumstances).

Next, while we find the evidence sufficient to create a fact issue with respect to the foreseeability prong of the proximate cause element, it is insufficient to create an issue on cause-in-fact. "Cause-in-fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Hooper v. Smallwood*, 270 S.W.3d 234, 240 (Tex. App.—Texarkana 2008, pet. denied). Sammy testified the forklift operator "would scoot over. And right there where them boards were at is where he needed to be, because every time he went to pick it up it just -- it wasn't -- what's the word I'm

---

[19]Also, Sammy did not present any evidence suggesting that stackers were required to anticipate that the trailers would be unloaded using a forklift in this case. Wall testified that forklifts were never used to load or unload trailers at PJ Trailers and that only overhead cranes were employed.

29

looking for here? It wasn't balanced." He continued, "As far as I know if that board right there wasn't there [the forklift operator] could have got there (indicating)."

Seminole argues that the causal connection between any alleged negligent stacking and the alleged injury is too tenuous to create legal liability. The Burchinals argue that this testimony establishes that "the forklift operator was unable to get a balanced grip on the stacked trailers due to the improper placements of the wooden blocks used for stacking. As a result, the stacked trailers became unbalanced during the unloading process." The Burchinals urge, "This testimony clearly represents evidence that the improper placement of the wooden blocks used for stacking was a substantial factor in bringing about Mr. Burchinal's injury."

Cause-in-fact "cannot be established by mere conjecture, guess, or speculation." *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). "If the defendant's negligence merely furnished a condition that made the injuries possible, there can be no cause in fact." *Id.* (citing *Mason*, 143 S.W.3d at 799).[20] Since the load was balanced throughout transport, only "became unbalanced during the [un]loading process," and Sammy's assertion that the board was improperly placed was conclusory, we find it was not enough to establish that the alleged improper placement was a substantial factor in bringing about Sammy's injuries. *See Driskill v. Ford Motor Co.*, 269 S.W.3d 199, 203 (Tex. App.—Texarkana 2008, no pet.) ("Less than a

---

[20]PJ Trailers cites to *Aleman*. Aleman was a truck driver for Ben E. Keith, a food distribution company. 227 S.W.3d at 308. He slipped and fell on water that leaked from the refrigeration unit while exiting a ramp from the trailer, and dropped a dolly of merchandise on his leg, breaking it. *Id.* He sued Ben E. Keith for, *inter alia*, negligent loading/unloading. *Id.* His testimony that Keith's employees would often load pallets on the trailers incorrectly amounted to "no evidence that Keith's negligent loading or unloading of trailers was the cause in fact of his injury." *Id.* at 313. Yet, Aleman did not testify that the merchandise was not loaded properly on the day of the accident, and the major focus in that case was failure to provide machinery that did not leak.

scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise of suspicion' of a fact.") (citation omitted).[21]

For the reasons stated above, we determine that the Burchinals failed to raise a genuine issue of material fact with respect to Seminole's negligence.[22]

## VI.    Ashley Burchinal's Derivative Claims Fail

Ashley testified that the accident "altered [Sammy] being able to work, to help out around the house, just help with the baby. He couldn't pick him up; he couldn't really do anything with him." She stated Sammy could be hard to live with when he was taking his medicine. The family was down to one income and had to move into her parent's home. She was required to "quit working to take care of him" at certain points in time. According to Ashley, the stress upon the marriage caused three or four overnight separations, loss of sleep, improper eating habits, and contributed to two miscarriages.

---

[21]PJ Trailers looked to the training required to be a stacker and contended that expert testimony was required to lay out the standard of care and prove breach. *See Stan Trans, Inc. v. Loughridge*, No. 01-98-00095-CV, 1999 WL 82614, at *6 (Tex. App.—Houston [1st Dist.] Feb. 4, 1999, pet. denied) (not designated for publication) ("We hold that the standard of care for the loading and unloading of chemicals is not within the experience of an average layman and that the appropriate standard of care, as well as the violation of that standard, must be established by expert testimony."); *see also Dewbre v. Anheuser-Busch, Inc.*, *No*. 10-08-00022-CV, 2008 WL 5093385 (Tex. App.—Waco Nov. 26, 2008, pet denied) (mem. op.). "Expert testimony is necessary when the alleged negligence is of such a nature as not to be within the experience of the layman." *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 90 (Tex. 2004). If expert testimony is required, it must be presented to raise a genuine issue of material fact at the summary judgment stage. *See Parker v. Three Rivers Flying Serv., Inc.*, 220 S.W.3d 160, 170 (Tex. App.—Eastland 2007, no pet.); *Simmons v. Briggs Equip. Trust*, 221 S.W.3d 109, 114–15 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Sammy testified the loads are "all stacked different," he was "not an expert on stacking," and "did not see [the board] placed there." Because we determine that Sammy's lay testimony did not present more than a scintilla of evidence on the required elements of standard of care and breach, we need not address the issue of whether expert testimony was required in this case. *See Driskill*, 269 S.W.3d at 205 (finding expert testimony was required to "bridg[e] the analytical gap" in determining cause-in-fact of an injury in face of no-evidence motion for summary judgment).

[22]Texmecana and PJ Trailers also complained that there was no medical expert testimony regarding Sammy's injuries. We need not address this nondispositive issue.

We have determined that Sammy's claims against Manufacturing were untimely asserted, Texmecana's duty was not established, and that more than a scintilla of evidence was not presented on breach of standard of care and cause in fact with respect to Sammy's claims against Seminole. Because Ashley's claims are derivative claims, they must likewise fail.[23] *Reed Tool Co. v. Copelin*, 610 S.W.2d 736, 738–39 (Tex. 1980) (tort feasor's liability for husband's physical injuries must be established as prerequisite to recovery of derivative claims such as wife's loss of consortium action); *see Toshiba Int'l Corp. v. Henry*, 152 S.W.3d 774, 785 (Tex. App.—Texarkana 2004, no pet.). Accordingly, the trial court's summary judgment with respect to Ashley's claims was proper.

## VII. Conclusion

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:     May 23, 2012
Date Decided:       June 15, 2012

---

[23]Loss of consortium is also a tort covered by the two-year statute of limitations, which accrues at the time of the first wrongful interference with interests such as "affection, solace, comfort, companionship, society, assistance, and sexual relations." *Trapnell v. Sysco Food Servs., Inc.*, 850 S.W.2d 529, 551 (Tex. App.—Corpus Christi 1992), *aff'd*, 890 S.W.2d 796 (Tex. 1994).